Stephen H.M. Bloch (UT #7813)
Landon Newell (UT #14738)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
landon@suwa.org

Attorneys for Plaintiffs
Living Rivers and Southern Utah Wilderness Alliance

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, SOUTHERN REGION OF THE CENTRAL DIVISION

| | |
|---|---|
| LIVING RIVERS and SOUTHERN UTAH WILDERNESS ALLIANCE, <br><br>    Plaintiffs, <br><br> v. <br><br> KENT HOFFMAN, in his official capacity as Deputy State Director, Division of Lands and Minerals, UNITED STATES DEPARTMENT OF THE INTERIOR, and UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br>    Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br><br> Case No. 4:19-cv-00057-DN <br><br> Judge David Nuffer |

## INTRODUCTION

1.  This lawsuit challenges decisions by the Bureau of Land Management ("BLM") to issue suspensions of operations and production for sixty-eight oil and gas leases in southern Utah's San Juan, Grand and Emery counties. The suspended leases are located near Canyonlands National Park and in the San Rafael Desert region of the Colorado Plateau.[1]

---

[1] The sixty-eight leases at issue in this lawsuit are listed in Exhibit 1.

2. Eight of the leases at issue in this litigation are located near the entrance to Dead Horse Point State Park and the Island in the Sky unit of Canyonlands National Park. This is one of the most scenic and photographed red rock landscapes in Utah.

3. The remaining sixty leases at issue in this litigation are sandwiched between Goblin Valley State Park and the newly designated San Rafael Reef Wilderness on the west and the Horseshoe Canyon unit of Canyonlands National Park, Labyrinth Canyon Wilderness and Dirty Devil region on the east and south. These are sublime and remote areas of federal public lands in Utah.

4. The majority of the leases encompass lands identified by BLM as possessing wilderness characteristics; that is, BLM has determined that the lands appear natural and undisturbed and provide outstanding opportunities for solitude and unconfined primitive types of recreation such as hiking, wildlife viewing and camping. This includes, but is not limited to, the Hatch Point / Hatch Wash, Labyrinth Canyon, San Rafael River and Sweetwater Reef lands with wilderness characteristics areas.



(Photograph taken from within lease UTU-93513 – a suspended lease in the San Rafael Desert at issue in this litigation. Looking east over other suspended leases at issue in this litigation. Copyright Ray Bloxham / SUWA).



(Photograph taken from within the Hatch Canyon / Hatch Wash lands with wilderness characteristics unit – an area encompassed by several suspended leases at issue in this litigation. Copyright Ray Bloxham / SUWA).

5.    The public lands encompassed by the eight leases near Dead Horse Point State Park and Canyonlands National Park provide exceptional views of jaw-dropping vast stretches of Utah's red rock wilderness formations, windswept landscapes, and some of the nation's most brilliant night skies uninhibited by human interference. Sandy benches, rugged sandstone outcrops and meandering draws and canyons dominate the uplands. The landscape is peppered with black brush and pinon and juniper, intermixed with native grasses, and collide with majestic and towering Wingate cliffs, buttes, and rock pillars, creating a wild and rugged geological phenomenon that has captured the hearts and minds of people from around the world.

6.    The San Rafael Desert likewise contains many unique and remarkable values including that it is home to one of the most astonishing diverse array of native pollinators (*e.g.*, bees, wasps) anywhere in North America. Researchers have found forty-nine different genera and 333 different species in this area. Forty-eight of these species were new to science and sixty-eight occur, as far as is known, only in the Canyonlands region of the Colorado Plateau.

7.    Many of the suspended leases in the San Rafael Desert contain fragile and irreplaceable cultural resources, reminders that this landscape was first home to Native Americans who inhabited and visited these lands for thousands of years before the first European explorers and settlers arrived.

8.    Several of the suspended leases in the San Rafael Desert are also located near newly designated Wilderness areas. *See generally* John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. 116-9, 133 Stat. 580, Part II. Emery County Public Land Management (March 12, 2019) (designating Labyrinth Canyon Wilderness and San Rafael Reef Wilderness).

9.    BLM suspended the sixty-eight leases at issue after the Southern Utah Wilderness

Alliance ("Alliance") filed two separate administrative appeals with the Interior Board of Land Appeals ("IBLA") challenging BLM's decision to offer the leases for competitive bidding at its March 2018 and September 2018 oil and gas lease sales.

10. BLM did not prepare an environmental review or analysis prior to issuing the lease suspensions.

11. BLM did not follow required procedures prior to issuing its lease suspension decisions in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h; the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551-559, 701-706; and the regulations and policies that implement these laws.

12. Accordingly, Plaintiffs seek a declaration that BLM's decision to suspend the sixty-eight leases was arbitrary, capricious, and contrary to law.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). This Court also can provide relief under 28 U.S.C. § 2201 (declaratory judgement); 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 553, 702 and 706 (APA).

14. The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, 706.

15. Venue in the District of Utah is appropriate under 28 U.S.C. § 1391(e) because it is where a substantial part of the events or omissions giving rise to the claims occurred and the federal public lands at issue are situated in this district.

## PARTIES

16. Plaintiff LIVING RIVERS is a non-profit environmental membership organization,

based in Moab, Utah. Living Rivers promotes river restoration and seeks to revive natural habitat and the spirit of rivers by undoing the extensive damage done by dams, diversions and pollution on the Colorado Plateau. Living Rivers articulates a conservation ethic of achieving ecological restoration balanced with meeting human needs. Living Rivers regularly comments on and protests proposed BLM activities, including oil and gas lease sales. Living Rivers' members benefit from BLM's compliance with federal laws, including NEPA. Living Rivers brings this action on its own behalf and on behalf of its members.

17. Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE is a non-profit environmental membership organization dedicated to the preservation of outstanding wilderness found throughout Utah, including in the Colorado Plateau, and the management of wilderness-quality lands in their natural state for the benefit of all Americans. The Alliance is headquartered in Salt Lake City, Utah, and has members in all fifty states and several foreign countries. The Alliance promotes local and national recognition of the region's unique character through research and public education and supports administrative and legislative initiatives to permanently protect Utah's wild places. The Alliance members benefit from BLM's compliance with federal laws, including NEPA. The Alliance's members expect that BLM will comply with all federal environmental laws including NEPA and its action forcing mechanisms in order to make an informed decision. The Alliance routinely comments on a variety of BLM proposals that threaten proposed wilderness across Utah, including oil and gas leasing and development like the ones at issue in this case. The Alliance brings this action on its own behalf and on behalf of its members.

18. Living Rivers and the Alliance are referred to throughout the remainder of this complaint collectively as "SUWA."

19. SUWA members frequently visit, enjoy, and observe the public lands at issue in this litigation including, but not limited to, Hatch Canyon / Hatch Wash, Labyrinth Canyon, and the San Rafael Desert. For example, Ray Bloxham, an employee and member of the Alliance and a member of Living Rivers, has visited and/or observed the leased public lands at issue in this lawsuit on multiple occasions including in October 2016, August 2018, March 2019, and most recently in April 2019. Mr. Bloxham has plans to return to these areas within the next year, and intends to continue to visit these public lands for years to come. Mr. Bloxham particularly enjoys the scenic views and largely untrammeled nature of the areas, including abundant wildlife, solitude and cultural and archaeological resources on his visits.

20. As a consequence of BLM's failure to comply with NEPA, the agency has acted before first considering the impacts of its decisions and as a result has made uninformed decisions that will have lasting effects to the public lands at issue in this litigation. This will impair SUWA's members' use and enjoyment of the public lands at issue, as well as adjacent public lands. SUWA was not provided an opportunity to comment on BLM's lease suspension decisions before they were made. SUWA's members also have a substantial interest in seeing that BLM complies with its obligations under federal laws including NEPA, its implementing regulations, and BLM's own policies. The relief sought herein, including an order to comply with these laws and policies, will redress these harms.

21. Defendant KENT HOFFMAN is sued in his official capacity as Deputy State Director, Division of Lands and Minerals, of BLM's Utah State Office. Deputy State Director Hoffman is responsible for overseeing Utah BLM's minerals program, including in the Colorado Plateau region. He signed the lease suspension decisions at issue in this litigation.

22. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the federal

7

agency responsible for protecting and managing much of this country's natural resources, public lands, and cultural heritage. The Department of the Interior is responsible for ensuring that BLM's management of the nation's public lands is in accordance with federal laws, including NEPA.

23. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency of the United States within the Department of the Interior. BLM is responsible for managing publicly-owned lands and minerals, in accordance with federal law. BLM is the agency that manages the public lands at issue in this litigation.

## LEGAL FRAMEWORK

### Administrative Procedures Act

24. The APA authorizes judicial review of agency actions and provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

### National Environmental Policy Act

25. NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two primary objectives: (1) to foster informed decisionmaking by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decisionmaking. *See id.* § 1500.1(c).

26. NEPA achieves its purpose through "'action-forcing' provisions to make sure that federal agencies act according to the letter and spirit of the Act." *Id.* § 1500.1(a).

8

27. The Council on Environmental Quality regulations implementing NEPA require federal agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2. *See also* 43 C.F.R. § 46.200 (Interior Department NEPA regulations, "Applying NEPA early").

28. To comply with NEPA, a federal agency must prepare one of the following prior to issuing a decision that is subject to NEPA: (1) an environmental impact statement ("EIS"), (2) an environmental assessment ("EA"), or (3) a categorical exclusion ("CX"). *See* 40 C.F.R. §§ 1508.4, 1508.9, 1508.11.

29. An EIS is a "detailed statement" that must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, and indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 42 U.S.C. § 4332(2)(C). *See also* 40 C.F.R. §§ 1502.14, 1502.16.

30. A federal agency may also prepare an EA to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

31. If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact. *Id.* § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13.

32. If an agency decides not to prepare an EIS or EA, it must then prepare a CX. *See id.* §

1508.4. "[CX] means a category of actions which do not individually or cumulatively have a significant effect on the human environment . . . and for which, therefore, neither an [EA] nor an [EIS] is required." *Id.*

33. "A CX is a form of NEPA compliance, without the analysis that occurs in an EA or EIS. It is not an exemption from the NEPA." BLM, National Environmental Policy Act, Handbook H-1790-1 § 4, pg. 14 (Jan. 2008) [hereinafter, "NEPA Handbook"].[2]

34. There are three forms of CXs available to BLM depending on the nature of the proposed action: (1) statutory CXs, (2) Department of the Interior CXs, and (3) BLM specific CXs.

    A. Statutory CXs are listed in Section 390 of the Energy Policy Act of 2005. *See* 42 U.S.C. § 15942(b);

    B. Department of the Interior CXs are listed at 43 C.F.R. § 46.210; and

    C. BLM specific CXs are listed in Department of the Interior, Department Manual, Part 516, Chapter 11.9 (May 8, 2008) [hereinafter, "Department Manual"],[3] and Appendix 4 of BLM's NEPA Handbook.

35. An oil and gas lease suspension is an action that is subject to a BLM specific CX. *See, e.g.*, Department Manual § 11.9.B(4), pg. 8; NEPA Handbook, App. 4 § B.4, pg. 147.

36. Before authorizing any action that is subject to a CX a federal agency "shall provide for [consideration of] extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4.

37. There are twelve "extraordinary circumstances" that must be considered by BLM. *See*

---

[2] Available at https://www.ntc.blm.gov/krc/uploads/366/NEPAHandbook_H-1790_508.pdf (last visited Aug. 2, 2019).
[3] Available at https://www.doi.gov/elips/search?template=All&query=%22Chapter%2011%3A%20MANAGING%20THE%20NEPA%20PROCESS--BUREAU%20OF%20LAND%20MANAGEMENT%22&archived=0 (last visited Aug. 2, 2019).

*generally* 43 C.F.R. § 46.215. These include, but are not limited to, actions that may "[h]ave a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." *Id.* § 46.215(f).

38. "If any of the extraordinary circumstances are applicable to the action being considered, either an EA or an EIS must be prepared for the action." NEPA Handbook, App. 4, pg. 147. *See also* Department Manual § 11.9 ("If a CX does not pass the 'extraordinary circumstances' test, the proposed action analysis defaults to either an EA or an EIS.").

## FACTUAL BACKGROUND

### BLM's Broken Oil and Gas Lease Suspension Process.

39. There are significant problems with BLM's management and oversight of oil and gas lease suspensions throughout the West, including Utah. The mismanagement of these suspensions has resulted in millions of dollars of lost revenue to U.S. taxpayers and precluded the leased public lands from being managed for multiple uses for the benefit of the public.

40. In a 2015 report, The Wilderness Society ("TWS") concluded that BLM's issuance of oil and gas lease suspensions has cost taxpayers more than $80 million in lost lease rentals. *See generally* TWS, Land Hoarders: How Stockpiling Leases is Costing Taxpayers (2015) ("TWS Suspension Report") (attached as Ex. 2).

41. The TWS report further explained that "[w]hile the leases are suspended, the oil and gas companies retain control of the lands; which prevents them from being managed for multiple uses for the benefit of the public – be it for recreation, conservation or possibly development by other companies." *Id.* at 1.

42. The TWS report identified three primary problems with BLM's lease suspensions: (1)

they are cheating U.S. taxpayers out of rental and royalty payments, (2) they allow industry to evade Congressional intent to diligently develop and provide timely and reasonable access to federal and oil and gas resources, and (3) they can preclude BLM's ability to achieve its multiple-use mandate. *Id.* at 2.

43. Based, in part, on the TWS report, members of Congress requested that the United States Government Accountability Office ("GAO") "conduct an evaluation of the BLM's use of [oil and gas lease] suspensions." Letter from Reps. Lowenthal, Grijalva, and Polis, to Mr. Gene Dodaro, Comptroller General of the GAO at 2 (Jan. 5, 2016) (attached as Ex. 3). The Congressmen explained that "[t]here is reason to be concerned with the BLM's capacity to monitor and enforce diligence requirements including ensuring that suspended leases are regularly reevaluated." *Id.* at 1. They expressed concern that "BLM may be regularly approving lease suspension requests for reasons beyond what Congress envisioned when this authority was established." *Id.* at 2. As a result, "outdated policies and insufficient oversight resources may have created a significant loophole that allows operators to extend the life of a lease without proper scrutiny." *Id.*

44. In its subsequent report, GAO highlighted many problems in BLM's application and management of oil and gas lease suspensions. *See generally* GAO, Report to Congressional Requesters, Oil and Gas Lease Management, BLM Could Improve Oversight of Lease Suspensions with Better Data and Monitoring Procedures (June 2018) ("GAO Suspension Report") (attached as Ex. 4). In its report the GAO determined, among other things:

    A. The reasons for BLM's lease suspensions are oftentimes difficult to determine. And,

    B. The approach BLM uses to monitor lease suspensions does not ensure consistent and effective oversight because the agency does not have procedures in place for monitoring.

45. As to the first point, the GAO explained that "BLM does not have quality information on the reasons for the suspensions." *Id.* at 19.

46. As to the second point, the GAO explained that "BLM uses an informal approach to monitor lease suspensions and does not have procedures in place for monitoring suspensions, which may not ensure consistent and effective oversight." *Id.* at 20.

47. Because BLM had failed to properly monitor oil and gas lease suspensions GAO concluded that BLM could not "ensure that federal lands are not being inappropriately kept from development – potentially foregoing revenue – or from other valuable uses of public lands." *Id.* at 25.

48. Both the GAO Suspension Report and TWS Suspension Report determined that oil and gas leases, once suspended, can remain suspended for decades even though the reasons originally relied on by BLM to justify the suspensions no longer exist. *See* GAO Suspension Report at 17 (stating that approximately twenty-eight percent of suspended leases had been in suspension for more than twenty years); TWS Suspension Report at 5-6 (providing examples of BLM's failure to adequately monitor or evaluate existing lease suspensions).

### The Utah-BLM March 2018 Oil and Gas Lease Sale.

49. Eight of the suspended leases at issue in this litigation were offered, sold, and issued at Utah-BLM's March 2018 oil and gas lease sale ("March 2018 Lease Sale"). *See, e.g.*, BLM, Notice of Competitive Oil and Gas Internet-Based Lease Sale (Dec. 1, 2017);[4] BLM, Canyon

---

[4] Available at https://www.blm.gov/sites/blm.gov/files/Programs_OilandGas_Leasing_RegionalLeaseSales_Utah_2018_Mar2018NoticeOfSale_0.pdf (last visited Aug. 2, 2019).

Country District March 2018 Competitive Oil and Gas Lease Sale – Determination of NEPA
Adequacy, DOI-BLM-UT-Y010-2017-0285-DNA.[5]

50. SUWA submitted comments on BLM's proposed March 2018 Lease Sale.[6] SUWA
also filed a protest of BLM's final leasing decision with the Utah-BLM State Director.[7] BLM
denied the protest on May 17, 2018.[8] The Alliance timely filed an appeal of BLM's protest
denial with the IBLA.

51. While the appeal was pending before the IBLA several federal court decisions related
to oil and gas leasing and development were issued that supported the Alliance's position on
appeal, including *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C 2019).

52. On May 3, 2019, counsel for BLM in the Alliance's pending March 2018 Lease Sale
appeal filed a Motion to Return Jurisdiction in which counsel requested that the IBLA "return
jurisdiction to BLM so that it can suspend the appealed leases and conduct additional NEPA
analysis." BLM Motion to Return Jurisdiction in IBLA No. 2018-166 at 2 (May 3, 2019). The
IBLA subsequently granted BLM's motion.

53. On May 30, 2019, the Alliance sent a letter to BLM explaining that the agency must
follow proper NEPA procedures prior to suspending the eight leases by, among other things (1)
preparing either an EIS, EA, or CX, and (2) considering whether "extraordinary circumstances"
existed in the present case. *See generally* The Alliance Letter to Messrs. Roberson and Hoffman,

---

[5] Available at https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName
=dispatchToPatternPage&currentPageId=130560 (last updated May 21, 2018).
[6] Comments available at https://eplanning.blm.gov/epl-front-office/projects/nepa/88117/126424/154035
/SUWA_on_DNA.pdf (last visited Aug. 2, 2019).
[7] Protest available at https://eplanning.blm.gov/epl-front-office/projects/nepa/88117/144863/178563/2018-01-
02_SUWA_DNA_Protest.pdf (last visited Aug. 2, 2019).
[8] Protest denial available at https://eplanning.blm.gov/epl-front-office/projects/nepa/88117/145489/179196/2018-05-
17_-_SUWA_Protest_Response_-_DNA_-eSignature.pdf (last visited Aug. 2, 2019).

*RE: IBLA No. 2018-166 and BLM's Pending Decision to Suspend the Oil and Gas Leases at Issue in that Appeal* (May 30, 2019).

**The Utah-BLM September 2018 Oil and Gas Lease Sale.**

54. The remaining sixty leases at issue in this litigation were offered, sold and issued at Utah-BLM's September 2018 oil and gas lease sale ("September 2018 Lease Sale"). *See, e.g.*, BLM, Notice of Competitive Oil and Gas Internet-Based Lease Sale (July 26, 2018);[9] BLM, September 2018 Oil and Gas Lease Sale, DOI-BLM-UT-0000-2018-0001-EA.[10]

55. The Alliance submitted "scoping" comments on BLM's proposed September 2018 Lease Sale.[11] BLM did not provide the public with a comment period on the draft leasing EA. The Alliance filed a protest with the Utah-BLM State Director over the September 2018 Lease Sale.[12] BLM denied the Alliance's protest on October 23, 2018.[13] The Alliance timely appealed BLM's protest denial to the IBLA.

56. On May 15, 2019, the Alliance sent BLM a letter highlighting (1) recent court decisions that supported its position on appeal, and (2) BLM's decision to pullback the March 2018 Lease Sale – which had suffered from the same legal flaws as BLM's September 2018 Lease Sale. *See generally* Alliance Letter *Re: Southern Utah Wilderness Alliance v. Bureau of Land Management, IBLA No. 2019-39* (May 15, 2019). In light of these similarities, the Alliance

---

[9] Available at https://eplanning.blm.gov/epl-front-office/projects/nepa/103243/152365/186588/1Sept2018NCLS.pdf (last visited Aug. 2, 2019).

[10] Available at https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=render DefaultPlanOrProjectSite&projectId=103243&dctmId=0b0003e8810c3ec2 (last updated Oct. 24, 2018).

[11] Scoping comments available at https://eplanning.blm.gov/epl-front-office/projects/nepa/103243/152459 /186675/2018-04-16_-_SUWA_et_al_-_Scoping_comments_on_PFO_Sept_2018_lease_sale.pdf (last visited Aug. 2, 2019).

[12] Protest available at https://eplanning.blm.gov/epl-front-office/projects/nepa/103243/159977/195622/2018-08-06_SUWA_et_al_Protest.pdf (last visited Aug. 2, 2019).

[13] BLM protest denial available at https://eplanning.blm.gov/epl-front-office/projects/nepa/103243/160356/196054/SUWA_PD_eSigned.pdf (last visited Aug. 2, 2019).

explained that "BLM should set-aside the September 2018 Lease Sale EA and accompanying Finding of No Significant Impact and Decision Record." *Id.* at 3.

57. On May 30, 2019, the Alliance filed a Motion to Withdraw Appeal with the IBLA. The IBLA subsequently granted that motion.

### BLM's Lease Suspension Decisions.

*September 2018 Lease Sale Leases*

58. On June 10, 2019, counsel for BLM e-mailed counsel for the Alliance to explain that "BLM has or will shortly begin the process of suspending the September 2018 leases that were the subject of [the Alliance's] appeal . . . BLM will begin the suspension process on all the subject leases in order to conduct curative NEPA analysis."

59. In response to counsel for BLM's e-mail, counsel for the Alliance asked several questions, including:

> What process does the BLM plan to follow to suspend the leases? For example, does BLM intend to prepare a NEPA document prior to suspending the leases (e.g., a CX or EA)? [The Alliance] has repeatedly argued in similar settings – and we make this same argument here – that the BLM must follow proper NEPA procedures prior to suspending the leases (for reference see the attached letter regarding the [Utah-BLM] March 2018 lease sale).[14]

60. Counsel for BLM responded that "I can immediately answer your question regarding NEPA and the suspension process. BLM is mindful of [the Alliance's] position, and they intend to prepare a NEPA document as part of the suspension process."

61. On June 21, 2019, in three separate – but nearly identical – two-page letters to the respective lessees BLM explained that it "has concluded that it is necessary to suspend the above-referenced lease until the completion of appropriate review under NEPA." BLM Letter to

---

[14] In the referenced letter, the Alliance explained to BLM that oil and gas lease suspensions are subject to a BLM specific CX and thus subject to NEPA's procedural requirements.

R&R Royalty at 1 (June 21, 2019); BLM Letter to Tacitus, LLC at 1 (June 21, 2019); BLM

Letter to NAH Utah, LLC at 1 (June 21, 2019).

62. The respective lease suspensions became effective July 1, 2019.

*March 2018 Lease Sale Leases*

63. As noted *supra*, as part of the March 2018 Lease Sale appeal BLM requested that the

IBLA remand the Alliance's appeal back to the agency so that it could "suspend the appealed

leases and conduct additional NEPA analysis." In response, the Alliance explained that BLM

needed to follow NEPA procedures prior to issuing the lease suspensions.

64. On July 17, 2019, in two separate – but nearly identical – two-page letters to the

respective lessees BLM explained that it "has concluded that it is necessary to suspend the

above-referenced lease until the completion of appropriate review under NEPA." BLM Letter to

Par Five Exploration, LLC at 1 (July 17, 2019); BLM Letter to Kirkwood Oil & Gas, LLC at 1

(July 17, 2019).

65. The respective lease suspensions became effective August 1, 2019.

66. BLM did not prepare a CX, EA, or EIS prior to suspending any of the sixty-eight

leases. Instead, its two-page letters merely highlight that BLM suspended the respective leases in

order to prepare curative NEPA analysis with regard to greenhouse gas emissions and climate

change. The letters do not contain NEPA analysis or provide for consideration of extraordinary

circumstances.

**The Alliance and Living Rivers Attempt to Resolve This Litigation.**

67. As noted *supra*, the Alliance has repeatedly reminded BLM that an oil and gas lease

suspension decision is subject to NEPA's procedural requirements. Most recently, in an effort to

avoid having to file the present litigation, SUWA sent a letter to the Utah-BLM State Director

and Defendant Mr. Hoffman explaining that BLM's decision to suspend the leases at issue in this

litigation violated NEPA. *See generally* SUWA Letter to Messrs. Roberson and Hoffman, *RE:*

*Utah-BLM Failure to follow NEPA procedures prior to issuing suspensions of operations and*

*production for certain oil and gas leases* (July 25, 2019).

68. SUWA stated that it would file federal litigation in this Court if BLM did not take

immediate action to "remedy its unlawful lease suspension decisions" and "prepare an EIS, EA,

or CX, prior to (re)issuing any future suspension decision for oil and gas leases in Utah."

69. BLM did not respond to SUWA's letter and did not take the requested actions.

## CAUSE OF ACTION
*Violation of NEPA: Failure to Prepare NEPA Document*
*Prior to Issuing Lease Suspension Decisions*

70. SUWA incorporates by reference all proceeding paragraphs.

71. NEPA "is our basic national charter for protection of the environment." 40 C.F.R. §

1500.1(a). It "contains 'action-forcing' provisions to make sure that federal agencies act

according to the letter and spirit of the Act." *Id.*

72. "NEPA procedures must insure that environmental information is available to public

officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b).

73. Prior to approving any action that is subject to NEPA a federal agency must prepare

(1) an EIS, (2) an EA, or (3) a CX. *See* 40 C.F.R. §§ 1508.4, 1508.9, 1508.11.

74. If an agency elects to prepare an EA or EIS then it must fully analyze all direct,

indirect, and cumulative impacts of the proposed action prior to authorizing that action. *See* 40

C.F.R. §§ 1508.7, 1508.8.

75. If an agency elects to prepare a CX then it "shall provide for [consideration of]

extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.* § 1508.4. *See also* Department Manual § 11.9, pg. 7 ("before any action described in the following list of CXs is used, the list of 'extraordinary circumstances" must be reviewed for applicability."); NEPA Handbook, App. 4, pg. 147 (same).

76. There are twelve "extraordinary circumstances" that must be considered by a federal agency. *See generally* 43 C.F.R. § 46.215. If any of the extraordinary circumstances are applicable then "further analysis and environmental documents must be prepared for the action." *Id.* § 46.205(c)(1).

77. An oil and gas lease suspension is an agency action that is subject to the procedural requirements of NEPA. *See* 40 C.F.R. § 1508.4; 43 C.F.R. § 46.215. *See also* Department Manual § 11.9.B(4), pg. 8 (listing "[a]pproval of . . . suspensions of operations and production" as a CX for which "the 'extraordinary circumstances' must be reviewed for applicability."); NEPA Handbook, App. 4 § B.4, pg. 147 (same).

78. BLM did not prepare an EIS prior to suspending the sixty-eight leases at issue in this litigation.

79. BLM did not prepare an EA prior to suspending the sixty-eight leases at issue in this litigation.

80. BLM did not prepare a CX prior to suspending the sixty-eight leases at issue in this litigation.

81. BLM did not consider whether "extraordinary circumstances" existed prior to suspending the sixty-eight leases at issue in this litigation.

82. BLM's lease suspension decisions violated the procedural requirements of NEPA and were arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A).

19

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgement in Plaintiffs' favor and

against Defendants and provide the following relief:

1. Declare that Defendants violated NEPA and acted arbitrarily, capriciously, and contrary to law by failing to prepare an EIS, EA, or CX prior to suspending the sixty-eight oil and gas leases at issue in this litigation;

2. Declare unlawful and vacate Defendants' lease suspension decisions discussed herein;

3. Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein, in particular to ensure that Defendants comply with all applicable NEPA procedures;

4. Award Plaintiffs the costs it has incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable provisions; and

5. Provide such other relief as the Court deems just and proper.


Respectfully submitted this 2nd day of August, 2019.


/s/ Landon Newell
Landon Newell
Stephen Bloch
Attorneys for Plaintiffs
Living Rivers and Southern Utah
Wilderness Alliance

20