*Living Rivers v. Hoffman et al.***, Case No. 4:19-cv-00057-DN**

Exhibit 4 – GAO Report to Congressional Requesters, Oil and Gas Lease Management, BLM Could Improve Oversight of Lease Suspensions with Better Data and Monitoring Procedures (June 2018)



United States Government Accountability Office

Report to Congressional Requesters

**June 2018**

# OIL AND GAS LEASE MANAGEMENT

# BLM Could Improve Oversight of Lease Suspensions with Better Data and Monitoring Procedures



# GAO Highlights

Highlights of GAO-18-411, a report to congressional requesters

June 2018

# OIL AND GAS LEASE MANAGEMENT

## BLM Could Improve Oversight of Lease Suspensions with Better Data and Monitoring Procedures

## Why GAO Did This Study

Oil and gas leases on federal lands generate billions of dollars in rents and royalty payments for the federal government each year, but these revenues can be reduced if leases are suspended (i.e., placed on hold). Questions have been raised about whether some suspensions, particularly those in effect for more than 10 years, may hinder oil and gas production or adversely affect the use of federal lands for other purposes, such as recreation.

GAO was asked to review oil and gas lease suspensions on federal lands managed by BLM. This report examines, among other things, (1) the extent of and reasons for such suspensions and (2) the approach BLM uses to monitor the status of lease suspensions. GAO analyzed all data on suspensions in a BLM database and the official lease files for a nongeneralizable sample of 48 leases recorded as suspended in, Montana and Wyoming, which GAO selected based in part on the large number of suspensions these states had. GAO also reviewed BLM documents and interviewed BLM officials.

## What GAO Recommends

To better ensure that federal lands are not being inappropriately kept from development, GAO is making four recommendations, including that BLM record the reasons for lease suspensions in its database and develop procedures for monitoring suspensions. Interior concurred with GAO's recommendations.

View GAO-18-411. For more information, contact Frank Rusco at (202) 512-3841 or ruscof@gao.gov.

## What GAO Found

According to data at the end of fiscal year 2016 from the Bureau of Land Management (BLM), a small portion of oil and gas leases were suspended for various lengths of time (as shown below), but the reasons for the suspensions were difficult to determine. During a suspension, the government generally does not collect revenues from the lease. Determining the reasons for suspensions is difficult, in part because BLM does not require the inclusion of this information in its database. To obtain this information, BLM officials would have to review the official lease files, of which many are in hard copy. Under *Standards for Internal Control in the Federal Government*, management should use quality information to achieve the entity's objectives. BLM field officials GAO interviewed said that additional, more detailed information in the database on reasons for suspensions would be helpful in tracking lease suspensions. By including a data field in the database to record the reasons for suspensions, BLM could better ensure that federal lands are not being inappropriately kept from development—potentially foregoing revenue—or from other valuable uses of public lands.

**Active Oil and Gas Leases and Leases Recorded as in Suspension by Length of Suspension, as of September 30, 2016**



Leases

Suspended leases

2,750 Suspended leases

38,250 Active leases

650 ≥ 30 years
630 < 3 years
1,150 ≥ 3 to < 10 years
190 ≥ 10 to < 20 years
130 ≥ 20 to < 30 years

Source: GAO analysis of Bureau of Land Management data.  |  GAO-18-411

Note: Numbers represented in the figure have been rounded.

The approach BLM uses to monitor lease suspensions does not ensure consistent and effective oversight because BLM does not have procedures in place for monitoring. BLM state offices generally delegate responsibility for monitoring lease suspensions to their field offices. Officials from 12 selected field offices in two states with relatively large numbers of lease suspensions reported various frequencies in their monitoring of suspensions, ranging from every few months to rarely or not at all. In the absence of BLM monitoring procedures, field officials have discretion in how and when to monitor. By developing procedures for monitoring lease suspensions, including when to conduct monitoring efforts, BLM could better ensure that lease suspensions in effect are warranted.

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 4 |
| | BLM Uses a Multistep Process in Determining Whether to Suspend Leases | 10 |
| | A Small Portion of BLM's Oil and Gas Leases Were Recorded as Suspended, but Reasons for Suspensions Were Difficult to Determine | 14 |
| | BLM Relies on an Informal Monitoring Approach That May Not Provide for Consistent and Effective Oversight of Lease Suspensions | 20 |
| | Conclusions | 24 |
| | Recommendations for Executive Action | 25 |
| | Agency Comments | 26 |
| Appendix I | Objectives, Scope, and Methodology | 28 |
| Appendix II | Bureau of Land Management Oil and Gas Leases, Suspensions, and Acreage, as of September 30, 2016 | 32 |
| Appendix III | Bureau of Land Management Oil and Gas Leases Recorded as in Suspension | 34 |
| Appendix IV | Comments from the Department of the Interior | 35 |
| Appendix V | GAO Contact and Staff Acknowledgments | 37 |

Tables

| | | |
|---|---|---|
| | Table 1: Bureau of Land Management (BLM) Oil and Gas Recorded Leases, Suspensions, and Acreage, as of September 30, 2016 | 32 |
| | Table 2: Bureau of Land Management (BLM) Oil and Gas Leases Recorded as in Suspension by Length and State, as of September 30, 2016 | 34 |

Figures

Figure 1: Circumstances That May Warrant Suspension of Oil and Gas Leases 11

Figure 2: Typical Bureau of Land Management (BLM) Review Process for Oil and Gas Lease Suspension Requests 13

Figure 3: Location of Oil and Gas Leases and Recorded Suspensions, as of September 30, 2016 16

Figure 4: Bureau of Land Management Oil and Gas Leases Recorded as in Suspension, by Length of Suspension, as of September 30, 2016 17

**Abbreviations**

| | |
|---|---|
| BLM | Bureau of Land Management |
| LR2000 | Legacy Rehost 2000 System |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

June 4, 2018

The Honorable Raúl Grijalva
Ranking Member
Committee on Natural Resources
House of Representatives

The Honorable Alan Lowenthal
Ranking Member
Subcommittee on Energy and Mineral Resources
Committee on Natural Resources
House of Representatives

The Honorable Jared Polis
House of Representatives

Oil and gas leases on onshore federal lands managed by the Department of the Interior's Bureau of Land Management (BLM) generate billions of dollars in rents and royalty payments for the federal government each year. According to BLM's database for mineral and land use—the Legacy Rehost 2000 System (LR2000)—approximately 41,000 oil and gas leases cover 28 million subsurface acres. Under the terms of these leases, operators have 10 years to begin drilling for oil and gas unless BLM suspends their leases.[1] BLM may suspend leases, for example, when an environmental review is necessary to avoid harm to endangered species on the leased lands or during periods of extraordinary weather conditions, such as hurricanes or other natural catastrophes. Suspensions typically remain in effect until the conditions that led to the suspensions no longer apply. There is no limit on how long a lease can be suspended. During a suspension of operations and production, the government does not collect rents or royalty payments and the time remaining to begin drilling is reserved so that the operator is not penalized for the time the lease is in suspension.

BLM is responsible for implementing the Federal Land Policy and Management Act of 1976, as amended, which directs Interior to manage federal lands for multiple uses, such as recreation and resource

---

[1]Lease terms may be extended if, for example, oil or gas is being produced in paying quantities. *See* 30 U.S.C. § 226(e).

extraction, while also taking any action required to prevent "unnecessary or undue degradation" of these lands.[2] Members of Congress and others have raised questions about whether some suspensions, particularly those that have been in effect for more than 10 years, may hinder oil and gas production or adversely affect the use of federal lands for other purposes, such as recreation.

You asked us to review oil and gas lease suspensions on lands that BLM manages. This report examines (1) the process BLM uses to determine whether to suspend oil and gas leases; (2) the extent of oil and gas lease suspensions and the reasons for the suspensions of selected leases; and (3) the approach that BLM uses to monitor the status of lease suspensions and the extent to which this approach provides for oversight of such lease suspensions.

To examine the process BLM uses to determine whether to suspend oil and gas leases, we reviewed applicable laws, agency documents, and the criteria used by BLM officials when considering lease suspensions. We also interviewed BLM officials about how they use these criteria. To examine the extent of oil and gas lease suspensions and the reasons for the suspensions, we analyzed data on all lease suspensions recorded in BLM's LR2000 database as of September 30, 2016.[3] We took a number of steps to assess the reliability of these data—such as checking the extent to which the data were complete and within expected ranges and interviewing BLM officials about how the data were collected—and determined that the data were sufficiently reliable to give a high-level summary of suspension information, such as the number of leases in suspension and the lengths of the suspensions (see app. I for additional detail).

We also analyzed information contained in the official lease files, maintained by BLM state offices, for a nongeneralizable sample of leases in suspension in Montana and Wyoming to identify the reasons behind the suspensions as well as to assess their status. We chose these states because they were among the states with the largest numbers of recorded lease suspensions. We also selected Montana because their files were electronically maintained and easily accessible and Wyoming

---

[2]43 U.S.C. § 1732.

[3]LR2000 contains information on all mineral and land assets managed by BLM, including oil and gas leases.

because it had some leases recorded as suspended for the longest period of time of any state as of September 30, 2016. We selected 48 suspended leases in these two states and limited the extent to which we selected multiple leases that were suspended at the same time for the same reason. For Montana leases, we found that there were only 12 suspension dates. Therefore, we randomly selected a single lease from each date. For Wyoming, we selected leases based on a combination of suspension date, similarity of lease numbers, and field office of jurisdiction. In addition, to review suspensions that had been in effect for a relatively long period of time, we selected suspensions that had been in effect for 20 or more years. The results of our review of selected leases are not generalizable to other BLM leases in suspension but provide examples of the types of reasons given for suspensions.

To verify the status of each selected lease, we compared information in LR2000 and the official lease file with information in the Office of Natural Resources Revenue's database.[4] We also interviewed officials from the BLM state and field offices in our sample about specific lease files to learn more about the status of specific lease suspensions and the reasons why these suspensions were still in effect. We compared how BLM maintains and verifies its lease suspension information with *Standards for Internal Control in the Federal Government* for information and communication.[5] To examine the approach BLM uses to monitor the status of lease suspensions and the extent to which this approach provides for oversight of such lease suspensions, we reviewed agency databases and documents, including information in LR2000 and selected lease files from the Montana and Wyoming state offices. These two state offices comprised a total of 12 field offices that were responsible for monitoring the 48 suspended leases in our sample.[6] We also interviewed BLM officials from BLM headquarters and those state and field offices to learn about how, if at all, they monitor lease suspensions or oversee such monitoring. We compared their actions with agency guidance, federal

---

[4]The Office of Natural Resources Revenue, within Interior, is responsible for collecting rental and royalty payments associated with oil and gas leases.

[5]GAO, *Standards for Internal Control in the Federal Government,* GAO-14-704G (Washington, D.C.: September 2014).

[6]Montana had 2 field offices and Wyoming had 10 field offices with leases included in our review of selected lease files. Montana had 8 additional field offices that did not have leases in our sample.

regulations, and federal standards for internal control for control activities.[7]

We conducted this performance audit from September 2016 to June 2018 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

This section provides information on oil and gas leasing and development on federally managed lands, lease revenues, lease suspensions, and BLM's LR2000 database.

## Oil and Gas Leasing and Development on Federally Managed Lands

BLM is responsible for managing approximately 700 million acres of subsurface mineral estate throughout the country, including the acreage it leases to operators for oil and gas development.[8] At the end of fiscal year 2016, about 41,000 oil and gas leases accounted for approximately 28.2 million acres in 32 states, according to BLM data (see app. II for additional details).

The Federal Land Policy and Management Act of 1976, as amended, requires the Secretary of the Interior to develop land use plans for public lands.[9] These plans identify federal lands and mineral resources that will be available for oil and gas leasing and development and other activities. The act requires the plans to be revised as appropriate, and BLM generally evaluates plans for potential revisions at least every 5 years.[10]

---

[7]GAO-14-704G.

[8]The Mineral Leasing Act of 1920, as amended, gives Interior responsibility for oil and gas leasing on federal and private lands where the federal government has retained mineral rights. 30 U.S.C. § 226. The Mineral Leasing Act for Acquired Lands of 1947 (30 U.S.C. § 351 et seq.) extended that authority to lands acquired by the federal government.

[9]43 U.S.C. § 1712.

[10]Revisions to land use plans are necessary if monitoring and evaluation findings, new data, new or revised policy, or changes in circumstances indicate that an entire plan or a major portion of a plan no longer serves as a useful guide for resource management. Bureau of Land Management, Department of the Interior, *Land Use Planning Handbook*, H-1601-1, p. 46 (Washington, D.C.: 2005).

As part of developing or revising land use plans, BLM is required under the National Environmental Policy Act of 1969, as amended, to evaluate likely environmental effects of any decisions in the plan, such as selecting areas for oil and gas development.[11] Generally, Interior prepares an environmental impact statement—a detailed statement of the likely environmental effects of the proposed action—in preparing land use plans.[12] BLM officials said the agency uses the land use plans and environmental impact statements to (1) help develop "reasonably foreseeable development scenarios" to estimate outcomes, such as the number of wells and likely surface disturbance that may occur under the land use plan; (2) identify lands open and closed to leasing; (3) identify resource-protection measures, such as lease stipulations and environmental best management practices; and (4) establish monitoring protocols. With a completed land use plan and its associated environmental impact statement, BLM can offer for lease the mineral rights identified in the plan.

The parcels of land that BLM offers for potential leasing and development are nominated by industry and the public or identified by BLM. BLM offers leases through a competitive bidding process and requires a uniform national minimum bid of $2 per acre, due as a one-time payment when a bidder is awarded the lease.[13] If BLM receives any bids on an offered lease, the lease is awarded to the bidder with the highest bid.[14] Since 1992, BLM has offered leases with a 10-year primary term—the initial period of time prescribed in a lease to begin oil and gas development.[15] Operators generally begin oil and gas exploration on leased lands by analyzing available geologic and seismic information and other testing to determine if economically viable oil and gas reservoirs exist. If the

---

[11]42 U.S.C. § 4332.

[12]BLM may also use an environmental assessment—which is a more concise analysis developed if the environmental effect of the proposed action is unknown—to determine whether the action is likely to significantly affect the environment.

[13]The Secretary of the Interior has the authority to raise the uniform national minimum acceptable bid for all leases but has not done so. *See* 30 U.S.C. § 226 (b)(1)(B).

[14]Leases that do not receive any bids in the initial offer are offered noncompetitively the day after and remain available for leasing for a period of 2 years after the competitive lease sale.

[15]The Energy Policy Act of 1992 required BLM to offer all competitive and noncompetitive leases with 10-year primary terms. Prior to 1992, BLM offered primary lease terms of 5 years for competitively sold leases and 10 years for leases issued noncompetitively.

findings are positive, the operators may begin efforts to prepare for development, such as completing the environmental studies required to apply for permits to begin lease development activities. For example, operators holding leases for oil and gas development must submit a drilling permit application to BLM and obtain approval before preparing the land and drilling new oil or gas wells.[16] After receiving a permit application, BLM generally communicates with operators until they provide all of the required documents, including necessary environmental information or studies.[17] The Energy Policy Act of 2005 requires BLM to approve or defer permit applications within 30 days of submission by the operator.[18] After such applications are approved, operators may begin development activities, including building roads to the well site, constructing platforms, drilling wells, and constructing additional pipeline transportation necessary to transport the oil and gas to market.

BLM has the authority to inspect federal oil and gas sites, including well pads and production facilities,[19] under the Federal Oil and Gas Royalty Management Act of 1982, as amended.[20] According to the agency's handbook for its inspection and enforcement program, BLM must ensure that oil and gas operations on federal lands are prudently conducted in a manner that ensures protection of the surface and subsurface environment.

---

[16]A complete drilling permit application, formally called an application for permit to drill, must include, among other things, a Surface Use Plan of Operations with the operator's plan for reclaiming disturbed lands during production and upon final abandonment. BLM may approve the application as submitted or, according to BLM officials, approve it with certain conditions that ensure environmental protection, safety, or conservation of mineral resources, and the approval may be based on environmental best management practices.

[17]Prior to leasing lands, BLM conducts broad environmental assessments. However, before drilling operations can begin, the operator must submit, with their application for permit to drill, an assessment of the environmental impact of their specific lease development plans.

[18]Pub. L. No. 109-58, § 366, 119 Stat. 594, 726 (2005), codified at 30 U.S.C. § 226(p)(2).

[19]Prior to drilling, an operator prepares the area of land where drilling will take place, referred to as a well pad. In some cases, multiple wells will be located on a single well pad.

[20]Pub. L. No. 97–451, tit. 1, § 108, 96 Stat. 2447, 2453 (1983), codified as amended at 30 U.S.C. § 1718.

## Lease Revenues

For issued leases, the operator pays a fixed amount of rent each year until the lease begins producing or expires. Under the Mineral Leasing Act of 1920, as amended, once a federal lease begins producing, the operator pays royalties on the oil and gas it produces in lieu of paying rent.[21] The act sets the royalty rate for competitive leases at not less than 12.5 percent of the amount or value of production.[22] A producing lease remains in effect so long as the operator continues to produce oil and gas in paying quantities.[23]

The Office of Natural Resources Revenue, within Interior, is responsible for managing and collecting revenues from operators that produce or extract resources from federal leases. In fiscal year 2016, approximately 164 million barrels of oil and 3.25 trillion cubic feet of gas were produced on federal lands, according to agency data. According to Office of Natural Resources Revenue data, in fiscal year 2016, the federal government collected approximately $1.6 billion in gross revenue from the production of these resources on federal land. The majority of this revenue—nearly $1.5 billion, or 91 percent—came from royalties. The remaining revenue came from bids made on new leases—more than $120 million—and rent for existing leases—more than $20 million.

## Lease Suspensions

According to agency guidance, specifically the *Suspensions of Operations and/or Production Manual*, BLM generally uses two types of suspensions for oil and gas leases: (1) suspension of operations or (2) suspension of operations and production.[24] A suspension of operations halts the operations associated with a particular lease, such as drilling or developing a well pad and roads. A suspension of operations and production—the most common type of suspension, according to BLM officials—is broader because it halts both operations and any production of oil and gas. BLM's guidance also states that a suspension of operations may be granted in cases in which the operator is prevented from operating or producing on the lease for reasons beyond the

---

[21]30 U.S.C. § 226(d); 43 C.F.R. § 3103.2-2.

[22]30 U.S.C. § 226(b)(1).

[23]30 U.S.C. § 226(b)(3)(D); 43 C.F.R. § 3107.2-1.

[24]There is a third type: suspension of production; however, this type of suspension is seldom used, according to BLM officials. *See* 43 C.F.R. § 3103.4-4.

operator's control, and a suspension of operations and production may be granted only in the interest of the conservation of natural resources.[25] During either type of suspension, the time remaining in the primary term of the lease is reserved until the suspension is terminated, so that the operator is not penalized for the time the lease is in suspension.

According to BLM officials, lease suspensions typically are initiated by the operator but may also be initiated by BLM. BLM guidance states that before an operator can request a suspension, the operator must first demonstrate being hampered in performing some operation or activity on the lease. The operator must submit thorough documentation of the reason for requesting a suspension and should include evidence that activity has been attempted on the lease, such as filing an application for a drilling permit, and that the activity has been prevented by actions beyond the operator's control. For BLM's part, according to BLM's guidance, requests filed less than 30 days prior to the expiration of the lease are considered late and should normally be denied. If a request is filed in a timely manner, BLM is to assess the request and, if the reasons for the request are acceptable and justify a suspension, BLM should approve the request, according to BLM guidance. The state director at each BLM state office is responsible for reviewing and approving requests for lease suspensions; however, BLM's guidance encourages the delegation of this responsibility to the field manager with jurisdiction over the lease. According to BLM officials, BLM state offices generally delegate responsibility for monitoring lease suspensions to their field offices.

## BLM's LR2000 Database and Other Interior Databases

According to BLM officials, LR2000 is a national database that provides internal and external users with access to, among other things, land and mineral use authorizations for oil, gas, and other mineral development; land titles; and other data extracted from case files that support BLM land, mineral, and resources programs. LR2000 contains information on

---

[25]The Mineral Leasing Act of 1920, as amended, defines the types of suspensions and the criteria that need to be met for each. Under Section 17, BLM can suspend either operations or production, while suspensions under Section 39 suspend both operations and production. Section 17 suspensions halt the term of the lease but rental and, if applicable, royalty payments continue. Section 39 suspensions of operations and production halt the term of the lease as well as any rent and royalty payments during the duration of the suspension. According to BLM guidance, suspension of production is unnecessary in most cases since the ability of the lease to produce oil or gas will generally prevent the lease from expiring.

approximately 6 million land and mineral case files. BLM designed the database for use by the oil and gas industry, mining industry, land and mineral title companies, utilities, state and local governments, interest groups, and members of the public that need access to BLM land and mineral case files.

The agency has conducted a series of reviews of LR2000 over the last 5 years in an attempt to improve the accuracy of the data in the system, according to BLM officials we interviewed.[26] In particular, the officials informed us that they created a tool, known as Data Flux, to improve the accuracy of the data, and that the tool has helped identify numerous data errors.[27] BLM officials told us that each spring a report is generated using Data Flux that highlights the errors found in LR2000, and BLM state offices are responsible for taking action to address the identified errors for their respective states. These officials also told us that BLM plans to either significantly update or replace LR2000 but has not set a definitive date for doing so.

Interior and BLM manage several other databases that contain information about the development and production of oil and gas on federal lands. In prior work, we found weaknesses in how Interior tracks and uses some information in its data systems. Specifically, in July 2010, we reported that BLM's publicly available data related to protests, or challenges, to lease sales were incomplete or inconsistent, and we recommended that Interior determine and implement an agency-wide approach for collecting protest information that is complete, consistent, and available to the public.[28] BLM agreed with the recommendation and issued guidance to standardize data collection. In addition, we found in July 2016 that Interior could improve the data it collects to help track progress toward its goal of reducing methane emissions from oil and gas operations.[29] We made four recommendations to improve BLM's reporting

---

[26]These reviews were intended to improve the quality of the data in LR2000 but did not necessarily address information contained in official lease files.

[27]According to agency officials, the Data Flux tool uses a set of business rules to examine data in LR2000 in order to identify data that do not match the prescribed format, such as numerical fields that contain letters.

[28]GAO, *Onshore Oil and Gas: BLM's Management of Public Protests to Its Lease Sales Needs Improvement,* GAO-10-670 (Washington, D.C.: July 30, 2010).

[29]GAO, *Oil and Gas: Interior Could Do More to Account for and Manage Natural Gas Emissions,* GAO-16-607 (Washington, D.C.: July 7, 2016).

of emissions data. The agency generally concurred with all of the recommendations and has implemented two of them. Further, in April 2017, we found that BLM field offices had not effectively used data collected during environmental inspections, which could have enhanced BLM's ability to assess and mitigate environmental impacts.[30] We recommended that BLM develop guidance and consistently track inspections data, among other things. BLM generally concurred with these recommendations.

## BLM Uses a Multistep Process in Determining Whether to Suspend Leases

BLM uses a multistep process to determine whether to suspend oil and gas leases, and this process, according to BLM guidance and officials, typically begins with an operator submitting a suspension request to the appropriate BLM field office.[31] Once the request is received, the cognizant BLM field official—usually a petroleum engineer at the field office— reviews it for completeness and whether the reasons cited meet the suspension criteria established in federal regulations and BLM's Suspensions of Operations and/or Production Manual. These criteria require that lease suspensions be approved only in the interest of the conservation of natural resources or for circumstances beyond the operator's control. Officials we interviewed stated that field officials generally have broad discretion in how to apply suspension criteria when considering a request. See figure 1, below, for examples of circumstances for which suspensions can be issued.

---

[30]GAO, *Oil and Gas Development: Improved Collection and Use of Data Could Enhance BLM's Ability to Assess and Mitigate Environment Impacts,* GAO-17-307 (Washington, D.C.: Apr. 25, 2017).

[31]In some cases, suspensions can be initiated, or directed, by BLM in response to unique circumstances, such as a court order.

**Figure 1: Circumstances That May Warrant Suspension of Oil and Gas Leases**

| Suspension of operations and production | Suspension of operations |
|---|---|
| The Bureau of Land Management (BLM) orders a suspension of all operational activities on a lease to protect natural resources (e.g., delay oil and gas drilling to allow extraction of coal). | Other federal or state agencies' actions prevent commencement or continuation of operations. |
| BLM denies proposal to operate for reasons of conservation of natural resources. | Extraordinary weather conditions—that is, conditions that are not reasonably expected or that are more severe than reasonably expected for the location and time of year—or other catastrophe prevent road construction or drilling. |
| BLM or other surface managing agency initiates environmental studies (e.g., environmental assessments, environmental impact statements, or resource management plans) that prohibit the use of the lease. | Extraordinary weather conditions prevent surveys of cultural resources or threatened and endangered species. |
| BLM or other surface-managing agency needs more time to arrive at the decision on a proposal. | The operator pursues litigation over title to lease or surface access. |
| Environmental litigation is ongoing related to issuance of leases or BLM lease management, and meanwhile no proposal to operate can be approved. | BLM denies proposal to operate for reasons other than for conservation of natural resources. |

Source: BLM's *Suspensions of Operations and/or Production Manual.* | GAO-18-411

According to BLM officials, if the field office recommends approving the operator's request for suspension, the field office is to forward the request to the appropriate BLM state office for final review, as shown in figure 2 below. In cases in which the state office agrees with the field office's recommendation, the state office is to issue a decision letter to the operator noting the changes to the terms and conditions of the lease. A copy of the letter is also to be sent to the Office of Natural Resources Revenue, if necessary, requesting deferment of rent and royalty payments while the lease is suspended.

Conversely, if the field office recommends that the suspension request be denied, the field office is to inform the operator in writing, BLM officials said. According to agency guidance, the operator can appeal the field office's recommendation to the state office director within 20 days after receiving the notification. The state director then has 10 days to render a decision.[32] If the state director denies the request for suspension, the

[32]The state director's final decision is to be issued within 10 days of the receipt of a complete request for administrative review or within 10 days after an oral presentation has been made.

operator can challenge the decision at the Interior Board of Land Appeals.[33] After the board's decision, the operator may make additional appeals in federal court. In cases in which a decision is overturned, the state office is to issue a decision letter to the operator that highlights changes in the lease's terms and conditions. The state office is to record the new terms and conditions in LR2000, notify the Office of Natural Resources Revenue of any rental or royalty payments that are to be deferred, and update the official lease file in the state office. Other affected parties (i.e. any party who is adversely affected by a decision) can also appeal a suspension decision, according to BLM officials.

---

[33]The Interior Board of Land Appeals is an appellate review body that exercises the delegated authority of the Secretary of the Interior to issue final decisions for the Department of the Interior. Its administrative judges decide appeals from bureau decisions relating to the use and disposition of public lands and their resources, mineral resources on the Outer Continental Shelf, and the conduct of surface coal mining operations under the Surface Mining Control and Reclamation Act. Located within the Department's Office of Hearings and Appeals, the board is separate and independent from the bureaus and offices whose decisions it reviews.

**Figure 2: Typical Bureau of Land Management (BLM) Review Process for Oil and Gas Lease Suspension Requests**



Source: GAO analysis of BLM documentation.  |  GAO-18-411

[a]The Office of Natural Resources Revenue, within the Department of the Interior, is responsible for collecting rental and royalty payments associated with leases on onshore federal lands. During a suspension of operations and production, both rental and minimum royalty payments are halted. Other types of suspensions do not halt collection of rental payments.

Agency officials stated that BLM field offices are primarily responsible for monitoring the status of lease suspensions they issue to ensure that the conditions for granting the suspension still exist.[34] If the conditions have changed, the field office is to recommend that the lease suspension be terminated and notify the operator. The state office is to terminate the suspension and send a letter to the operator with the updated lease terms and conditions, which should extend the original lease expiration date to reflect the length of the suspension.[35] BLM guidance states that the state office also is to send a copy of the suspension termination letter to the Office of Natural Resources Revenue to alert that office that any rental and royalty payments on hold for the lease should resume. The state office is then responsible for updating LR2000 and the official lease file regarding any new lease terms and conditions, according to BLM officials.

## A Small Portion of BLM's Oil and Gas Leases Were Recorded as Suspended, but Reasons for Suspensions Were Difficult to Determine

A small portion of BLM's oil and gas leases were suspended as of the end of fiscal year 2016, according to the agency's LR2000 data, but the reasons for the suspensions were difficult to determine. These data indicated that as of September 2016, about 2,750 of BLM's approximately 41,000 oil and gas leases were suspended in various locations for various lengths of time. LR2000 did not always contain the reasons for suspensions, which required us to take additional steps to identify the reasons.

---

[34]BLM officials we interviewed stated that most lease suspensions are approved by field offices and the field offices would be responsible monitoring these suspensions. Suspensions issued by the state office would be monitored by the state office.

[35]For example, if a suspension was in effect for 3 years, the primary lease term would be extended by 3 years.

## As of September 2016, about 2,750 Oil and Gas Leases Were Recorded as Suspended and Varied in Their Location and Length of Suspension

According to LR2000 data, approximately 2,750 oil and gas leases were suspended at the end of fiscal year 2016. Our analysis of these data showed that the lease suspensions spanned 16 states and accounted for about 3.4 million acres of federally managed land. The data also showed that most of the suspensions were in five Mountain West states: Colorado, Montana, New Mexico, Utah, and Wyoming. These five states accounted for more than 2,350 of the approximately 2,750 recorded lease suspensions and encompassed more than 2.9 million acres of federally managed land (see app. II for additional details).[36] Figure 3, below, provides information on the location of oil and gas leases and recorded suspensions across the United States.

---

[36]According to BLM data, these five states also accounted for nearly 32,000 of BLM's 41,000 leases as of September 30, 2016.

**Figure 3: Location of Oil and Gas Leases and Recorded Suspensions, as of September 30, 2016**



Sources: GAO analysis of Bureau of Land Management data; Map Resources (map).  |  GAO-18-411

Our analysis of LR2000 data showed that, of the approximately 2,750 recorded lease suspensions,

- about 630 had been in place for less than 3 years,

- about 1,150 had been in place for 3 years to less than 10 years,

- about 190 had been in place for 10 years to less than 20 years,

- about 130 had been in place for 20 years to less than 30 years, and

- about 650 had been in place for 30 years or more.

See figure 4 and appendix III for additional details.

**Figure 4: Bureau of Land Management Oil and Gas Leases Recorded as in Suspension, by Length of Suspension, as of September 30, 2016**



Source: GAO analysis of Bureau of Land Management data.  |  GAO-18-411

Note: Numbers represented in the figure have been rounded. The length of a lease suspension was calculated based on when the suspension was first issued through the end of fiscal year 2016—September 30, 2016.

## Reasons for Suspensions Were Not Always Recorded in BLM's Database and Required Reviews of Official Lease Files to Identify

BLM's database, LR2000, did not always contain information on the reasons for oil and gas lease suspensions. BLM officials said that while LR2000 does not have a field to specifically capture the reason for a suspension, and inclusion of this information is not mandatory, the general remarks field could be used for this purpose.

Because we found this remarks field was rarely used to capture the reason for suspensions, we reviewed the official lease files for a sample of 48 leases in Montana and Wyoming that were suspended as of September 30, 2016, and we interviewed field office staff for clarification. The reasons for suspensions in this sample generally fell into four broad categories: environmental reviews, delays in reviewing applications for permits to drill, logistical conflicts, and other reasons.

Our review of the official lease files for our sample found the following reasons cited for suspensions:

- Sixteen leases were suspended for large-scale environmental concerns, such as wilderness or wildlife protection areas or environmental reviews that affected large parcels of land. These 16 suspensions had been in effect for approximately 6 years to 38 years. One of these leases was suspended because of a court order that also resulted in suspension of 422 other leases; the leases suspended as a result of this court order accounted for most of the suspensions that had been in place for more than 30 years.[37]

- Fourteen leases were suspended because BLM required additional time to complete its review of the operator's drilling permit application. These 14 suspensions had been in effect for approximately 1 year to 13 years. Seven of these 14 suspensions were issued because BLM needed additional time to review the environmental assessments submitted with the drilling permit applications.

---

[37]These leases were located on federal lands in Montana. The court ruled that no further action on the leases could occur without additional environmental and wildlife analyses. File documents from the Forest Service indicate that there was little interest at that time in conducting these analyses because of, among other things, their expense, and that there was also little interest from operators in developing these lands for oil and gas production. *Conner v. Burford,* 605 F. Supp. 107 (D. Mont. 1985), *affd in part and rev'd in part,* 836 F.2d 1521 (9th Cir. 1988), *superseded,* 848 F.2d 1441 (9th Cir. 1988), *cert denied sub. nom.,* Sun Exploration & Prod. Co. v. Lujan, 489 U.S. 1012 (1989).

- Eight leases were suspended because they faced logistical conflicts with other surface development, such as mining activities occurring on the lease or adjacent lands. These suspensions had been in effect for approximately 4 years to 25 years.

- Five leases were suspended for other, short-term reasons, such as weather-related issues or economic conditions, but were recorded in LR2000 as suspended for approximately 22 years to 74 years.[38]

- We were unable to determine the reasons why the 5 remaining leases were suspended. These leases were recorded as suspended for approximately 28 to 82 years. The agency was unable to provide lease files for 1 of the leases. Field officials said that some of these suspensions may have been issued at the state level, and the officials had no additional information on them.

According to *Standards for Internal Control in the Federal Government*, management should use quality information to achieve the entity's objectives; quality information may be defined as appropriate, current, complete, accurate, accessible, and provided on a timely basis.[39] BLM does not have quality information on the reasons for suspensions, in part because such reasons are not routinely included in LR2000, and there is no specific data field for them. To obtain this information, BLM officials would have to review the official lease files, as we did, and most of the files were available only in hard copy in BLM state offices. Therefore, the information is not readily accessible across the agency. Field officials we interviewed from one field office said that additional information on reasons for suspension in the database would be helpful in monitoring lease suspensions and in communicating with others, such as management or the public, about suspensions. BLM headquarters officials said they are planning to update or replace LR2000. By including a data field in the update or replacement for LR2000 to record the reasons for suspensions, BLM could better ensure that federal lands are not being inappropriately kept from development—potentially foregoing revenue—or from valuable uses of public lands.

---

[38]As discussed later in this report, officials from relevant field offices indicated that these suspensions were not in effect for this period of time and that the information in LR2000 was outdated.

[39]GAO-14-704G.

# BLM Relies on an Informal Monitoring Approach That May Not Provide for Consistent and Effective Oversight of Lease Suspensions

BLM uses an informal approach to monitor lease suspensions and does not have procedures in place for monitoring suspensions, which may not ensure consistent and effective oversight. We also found that BLM's state offices do not always maintain current information on lease suspensions in the official lease files or LR2000, and BLM headquarters and state officials told us they generally do not oversee the monitoring of lease suspensions.

## Monitoring Varies Among Field Offices, and BLM Does Not Have Procedures for How to Conduct It

Field offices vary in how they monitor lease suspensions, and BLM does not have official agency procedures in place for monitoring, relying instead on an informal approach. We found that the field offices we reviewed differed in the frequency of their monitoring activities for lease suspensions.[40] According to officials we interviewed from these offices:

- 8 field offices monitor with varying frequency, depending on the circumstances; and

- 3 field offices monitor rarely.

Officials who monitored with varying frequency said that the frequency depends in part on the nature of the suspension. For instance, they said suspensions that involve seasonal protection of wildlife habitat, which can last for several months, typically require relatively little monitoring because the time frames for these suspensions are more clearly defined. In contrast, suspensions involving environmental reviews often require more frequent monitoring because the time frames associated with these suspensions are less definitive and can range from several months to several years. Several of these officials said that their offices have established prompts to alert staff when to conduct monitoring activities. For example, an official from 1 field office told us the office's staff use handwritten notes to track their lease suspensions. An official from another field office informed us that their office uses an electronic calendar feature to alert staff when to monitor, and several other field office officials reported that they rely on various spreadsheets and emails

---

[40]We reviewed a total of 12 field offices; however, 1 field office did not respond to our request for information on monitoring of lease suspensions.

to remind them when to monitor. Officials from 1 field office also stated that their office uses an estimated end date for every suspension[41]—that is, the date the suspension is expected to terminate—to prompt them to review the current conditions to ensure that the suspension is still warranted.

Officials who monitored with varying frequency also said that the frequency depends on the availability of staff for monitoring. These officials said they generally rely on petroleum engineers in their respective offices to monitor lease suspensions because these individuals are normally the most familiar with leases.[42] However, some officials added that staffing limitations, particularly a shortage in petroleum engineers, have hindered their ability to monitor lease suspensions in a timely manner. Several of the field officials we interviewed noted that, in recent years, they have had to rely on other staff or petroleum engineers who were on loan from other field offices because their offices did not have a petroleum engineer on staff. According to two field officials we interviewed, while assistance from other field offices is needed and appreciated, there is invariably a lack of consistency in the knowledge that engineers from other offices have about the lease sites involved. Field officials also said that there have been instances in which petroleum engineers left the agency for the private sector, resulting in a loss of institutional knowledge about certain leases, possibly contributing to lapses in follow-up on particular leases. Officials from offices that rarely or never conduct monitoring also cited problems with staff availability. We reported on human capital challenges at BLM, specifically in hiring and retaining petroleum engineers, in March 2010.[43] We also noted BLM's human capital constraints in our High-Risk Series update report in February 2011, and we reported on human capital issues at BLM in

---

[41]End dates are estimated because it is difficult to predict the period of delay, and BLM's guidance states that suspensions should be granted for an indefinite term.

[42]Several field officials we interviewed informed us that they also rely on legal staff to assist with follow-up on lease suspensions, typically when legal documents are prepared for a lease, such as when the term and conditions of a lease are revised because of a suspension or in cases where a suspension has been terminated. They stated that these activities are usually one-time events and do not involve the routine monitoring of lease suspensions.

[43]GAO, *Oil and Gas Management: Interior's Oil and Gas Production Verification Efforts Do Not Provide Reasonable Assurance of Accurate Measurement of Production Volumes*, GAO-10-313 (Washington, D.C.: Mar. 15, 2010).

January 2014 and September 2016.[44] In several of these reports, we recommended that BLM take a number of actions, including using existing authorities and incentives to improve staff retention. BLM generally agreed with these recommendations and has taken action on some, but not all, of these recommendations.

Nonetheless, the extent of variability we found, including 3 field offices that monitor rarely or not at all, indicates that allowing individual field offices to determine when to monitor suspensions may not ensure that monitoring takes place. Under *Standards for Internal Control in the Federal Government*, management should design control activities, such as procedures, to ensure the objectives of the program are achieved.[45] The Office of Management and Budget has also acknowledged the importance of internal guidance documents to channel the discretion of employees, increase efficiency, and enhance the fair treatment of similarly situated parties.[46] Some field officials we interviewed said that procedures to help guide them on monitoring could be beneficial and provide a level of consistency. By developing procedures for monitoring lease suspensions, including when to conduct monitoring efforts, BLM could promote more consistent monitoring to better ensure that lease suspensions in effect are warranted.

## BLM State Offices and Headquarters Generally Do Not Oversee Field Office Monitoring of Lease Suspensions and Do Not Always Have Current or Complete Information on Suspensions

Officials from BLM's state offices told us that they do not oversee field office monitoring of suspensions, and we found that they did not always have current or complete information on suspensions. We found that more than three-quarters of the official lease files in BLM state offices we reviewed contained outdated documentation regarding the status of lease suspensions. Specifically, files for 37 of the 48 lease suspensions we reviewed did not contain updated information on whether the lease suspension had been monitored or reviewed since the suspension was initially issued. For example, we reviewed a lease file for a suspension issued in 1949 for economic reasons, but the file only contained

---

[44]GAO, *High-Risk: An Update*, GAO-11-278 (Washington, D.C.: February 2011); *Oil and Gas: Interior Has Begun to Address Hiring and Retention Challenges but Needs to Do More*, GAO-14-205 (Washington, D.C.: Jan. 31, 2014); and *Oil and Gas Oversight: Interior Has Taken Steps to Address Staff Hiring, Retention, and Training but Needs a More Evaluative and Collaborative Approach*, GAO-16-742 (Washington, D.C.: Sept. 19, 2016).

[45]GAO-14-704G.

[46]Office of Management and Budget, *Final Bulletin for Agency Good Guidance Practices*, 72 Fed. Reg. 3432 (Jan. 25, 2007).

information on the suspension issuance and not whether monitoring occurred to assess the economic conditions associated with the lease. Additionally, we discovered that some official lease files were not complete and did not have certain required information, such as letters issuing the suspension. For example, three of the lease files we reviewed were missing required information. We could not verify the reasons these leases were suspended, their current status, or any information concerning monitoring efforts associated with them. Field officials we interviewed did not have any information on these suspensions and said that they may have been initiated by the state office more than 30 years ago. However, BLM state officials were unable to confirm or deny this. For another lease, there was no lease file. Officials in BLM headquarters and state offices said that there is no requirement for them to oversee the field offices' monitoring activities. However, they said that performing such oversight could help to ensure effective and consistent monitoring of lease suspensions.

We also identified some instances in LR2000 where data on suspensions were not up to date. Specifically, 7 of the 48 leases we reviewed were recorded in LR2000 as suspended, but information we received from agency officials indicated that the suspensions were no longer warranted. We later confirmed with state and field officials that none of the 7 suspensions remained in effect. Five of these 7 leases were recorded as being in suspension for 22 years or more for what appeared to be short-term reasons, such as weather-related issues or economic conditions. One Wyoming suspension, for instance, was granted in 1990 because of low oil prices at the time, which made repairing wells uneconomical. While this lease was still recorded as suspended in LR2000 as of September 2016, a termination letter in the lease file indicated that the suspension was terminated in 1991. In another example, a lease was listed in the official lease file as suspended for 3 years because of delays in processing a drilling permit application. When we followed up with field officials about the lease, they informed us that the suspension should have been terminated years ago; however, we found no termination letter in the official lease file maintained by the state office. Field officials speculated that the letter may not have been sent because the case manager had retired and no one in the field office knew to follow up on the lease. Because field officials informed us that these leases were no longer suspended, we confirmed with officials from Interior's Office of

Natural Resources Revenue that payments were being appropriately collected for these 7 leases.[47]

Moreover, these data are not available in a standardized report that could be used to help oversee monitoring, such as a report showing the average length or frequency of suspensions. BLM produces standardized reports from LR2000 for other aspects of oil and gas leases, such as when leases have been issued or are set to expire. BLM officials said that a standardized report for lease suspensions could assist headquarters and state officials in conducting oversight of field offices' monitoring efforts.

*Standards for Internal Control in the Federal Government* state that management should design control activities, such as conducting top-level reviews of actual performance, to ensure the objectives of the program are being achieved.[48] By requiring that management, particularly cognizant headquarters and state office officials, conduct top-level reviews of field offices' monitoring efforts, as well as top-level reviews of official lease files and databases, BLM could better ensure that lease suspensions in effect continue to be warranted and that information on suspensions is current and complete. Additionally, federal standards for internal control state that management should design control activities, such as developing mechanisms that enforce management's directives, to achieve the entity's objectives and address related risks. By developing mechanisms, such as summary reports on lease suspensions, as BLM updates or replaces LR2000, BLM could assist cognizant officials in headquarters and state offices with their oversight of monitoring.

## Conclusions

The ability of federal agencies to manage their programs effectively depends in part on the information systems the agencies use and the quality of the data within these systems. Over the past several years, BLM has worked to improve the quality of the data in LR2000, including data related to oil and gas lease suspensions. These efforts have helped to improve the accuracy of certain data, but they do not address some

---

[47]The Office of Natural Resources Revenue tracks rents and royalty payments collected from oil and gas leases using a separate database. Office of Natural Resources Revenue officials informed us that their database does not electronically communicate with LR2000, and staff must manually convert identification numbers from LR2000 in order to cross check these leases against their database.

[48]GAO-14-704G.

constraints of LR2000. In particular, LR2000 does not contain a data field for recording the reasons for suspensions. BLM officials told us that they will upgrade or replace LR2000 in the near future. By including a data field in the update or replacement for LR2000 to record the reasons for suspensions, BLM could better ensure that federal lands are not being inappropriately kept from development—potentially foregoing revenue—or from other valuable uses of public lands.

BLM's ability to effectively manage the program also depends on the establishment of effective internal controls. To date, BLM has not developed procedures for monitoring lease suspensions. By developing procedures for monitoring lease suspensions, including when to conduct monitoring efforts, BLM could promote more consistent monitoring to better ensure that lease suspensions in effect are warranted. Additionally, BLM does not conduct top-level reviews to oversee field offices' monitoring efforts, and we found instances in which BLM's information on suspensions was outdated or incomplete. By requiring that management, particularly cognizant headquarters and state office officials, conduct reviews of field offices' monitoring efforts, as well as official lease files and databases, BLM could better ensure that information on suspensions is current and complete. Finally, BLM does not have mechanisms to provide officials with some key information relevant for oversight, such as when suspensions were last reviewed or the average length and frequency of suspensions. By developing mechanisms, such as summary reports on lease suspensions, as BLM updates or replaces LR2000, BLM could assist cognizant officials in headquarters and state offices with their oversight of monitoring.

# Recommendations for Executive Action

We are making the following four recommendations to BLM:

As BLM updates or replaces its database, the Director of BLM should include a data field to record the reasons for suspensions. (Recommendation 1)

The Director of BLM should develop official agency procedures for monitoring oil and gas lease suspensions, including when to conduct monitoring activities. (Recommendation 2)

The Director of BLM should require cognizant officials in headquarters and state offices to conduct top-level reviews of field offices' monitoring of oil and gas lease suspensions, as well as of official lease files and databases to ensure they are current and complete. (Recommendation 3)

As BLM updates or replaces LR2000, the Director of BLM should ensure the development of mechanisms, such as standardized summary reports on lease suspensions, to assist cognizant officials in headquarters and state offices with oversight of field offices' monitoring efforts. (Recommendation 4)

# Agency Comments

We provided a draft of this report to Interior for review and comment. In its comments, reproduced in appendix IV, Interior generally agreed with our findings and recommendations.  Interior also outlined plans for addressing the recommendations.

Regarding our first recommendation, Interior stated that it agrees that any future database used to track information on oil and gas lease suspensions should include a data field to more explicitly record the reasons for suspensions.

Interior also stated that it will develop standardized procedures for monitoring oil and gas lease suspensions, consistent with our second recommendation. These procedures will be instituted agency-wide, according to Interior, and agency policy and handbooks will be updated as needed to implement the procedures.

With respect to our third recommendation, Interior stated that it will provide updated guidance and online training to assist the state and field offices in managing, monitoring, and reviewing lease suspensions. These actions are positive steps and may address our recommendation depending on their implementation.

Finally, consistent with our fourth recommendation, Interior stated that any future update to or replacement of LR2000 database will include the capability to create standardized reports for oil and gas lease suspensions.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the appropriate congressional committees, the Secretary of the Interior, and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff members have any questions about this report, please contact me at (202) 512-3841 or ruscof@gao.gov. Contact points for our Office of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix V.

Frank Rusco
Director, Natural Resources and Environment

# Appendix I: Objectives, Scope, and Methodology

This report examines (1) the process the Bureau of Land Management (BLM) uses to determine whether to suspend oil and gas leases; (2) the extent of oil and gas lease suspensions and the reasons for the suspensions of selected leases; and (3) the approach that BLM uses to monitor the status of lease suspensions and the extent to which this approach allows for oversight of such lease suspensions.

To examine the process BLM uses to determine whether to suspend oil and gas leases, we reviewed applicable laws, agency documents, and the criteria BLM uses when considering lease suspensions. Specifically, we reviewed BLM's statutory requirements for granting a lease suspension. We also reviewed BLM's guidance for reviewing suspension requests—*Suspensions of Operations and/or Production Manual*—which outlines the process and criteria BLM uses to approve or deny a lease suspension request as well as the process for appealing a suspension decision. We interviewed BLM officials at headquarters, as well as state and field offices responsible for leases in our review, about how they apply these criteria when assessing suspension requests. We also interviewed representatives from the Interior Board of Land Appeals about suspension decisions that are appealed to the board, how these appeals are handled, board decisions that are subsequently appealed, and the process involved with those appeals.

To examine the extent of oil and gas lease suspensions and the reasons for the suspensions of selected leases, we analyzed data on lease suspensions from BLM's Legacy Rehost 2000 System (LR2000) database as of September 30, 2016.[1] We took a number of steps to assess the reliability of suspension data and related fields in LR2000. Specifically, we performed electronic tests to check the extent to which data were complete and within expected ranges. Testing included comparison of data extractions prepared by BLM officials for us against data we downloaded directly from LR2000. We also interviewed BLM officials responsible for managing the system about how data are collected and entered into the system as well as the steps the officials take to help ensure that the data are accurate and complete. We also clarified discrepancies regarding lease suspension data with these officials when necessary. We determined the data were sufficiently reliable to give a high-level summary on suspensions, including

---

[1]LR2000 contains information on all mineral and land assets managed by BLM, including oil and gas leases.

information on the number and location of leases, the number in suspension, and suspension length.

LR2000 contains information on activities related to an oil and gas lease's status, among other things. For each lease, we identified the latest record, if any, for actions in fiscal year 2016 and earlier that indicate suspension initiation or termination. We determined that a lease was in suspension if the most recent action related to a suspension indicated that the suspension was initiated. We determined the length of suspension based on the date of that initiation record. We then determined distributions of the numbers of leases recorded as still in suspension in each state as of the end of fiscal year 2016.

We also reviewed the official lease files, maintained by BLM state offices, for a nongeneralizable sample of leases recorded as suspended as of September 30, 2016, in Montana and Wyoming to assess their status and the reasons behind the suspensions. We chose these two states because they were among the states with the largest numbers of suspended leases. Montana's official lease files were electronically maintained and easily accessible, while Wyoming, which had leases recorded as suspended for the longest period of time as of September 30, 2016, maintained hard copy official lease files. Montana and Wyoming collectively represent about 50 percent of all oil and gas leases recorded as suspended. We used the following approaches to select a sample of 48 suspended leases in these states and limited the extent to which we selected multiple leases that were suspended at the same time for the same reason.

For Montana leases, we found that only 12 suspension initiation dates were recorded for the leases in suspension as of the end of fiscal year 2016. We therefore randomly selected for review a single lease from those suspended on each of these dates. For Wyoming, the suspension initiation dates were much more dispersed, so we identified groups of 15 or more leases based on a combination of suspension date, similarity of lease numbers, and the field office of jurisdiction. From these groups, we selected 19 suspended leases—each lease was the lease with largest acreage from each field office within its group. There were a number of leases that did not fit into these groups because there were fewer than 15 suspensions on a given date with similar lease numbers, so we selected a single lease file with the largest acreage from each year that was at least 20 years old. This allowed us to review suspensions that have been in effect for a relatively long period of time. This approach resulted in our selection of an additional 17 suspended leases in Wyoming. While our

review of suspended lease files is not generalizable to other BLM lease suspensions, our findings provide examples of types of reasons that are cited for lease suspensions.

To verify the status of each selected lease, we compared information in LR2000 and the official lease file to information in the Offices of Natural Resources Revenue's database. The Office of Natural Resources Revenue, within the Department of the Interior, is responsible for collecting rental and royalty payments associated with oil and gas leases. We also interviewed the BLM state and field office officials responsible for the specific lease files we reviewed to obtain additional information about the status of certain lease suspensions and the reasons these suspensions remained in effect. We compared how BLM maintains and verifies its lease suspension information with *Standards for Internal Control in the Federal Government* for information and communication.[2]

To examine the approach BLM uses to monitor the status of lease suspensions and the extent to which the approach provides for oversight, we reviewed agency data, guidance and requirements, and official lease documents. In particular, we reviewed monitoring information in LR2000, BLM's *Suspensions of Operations and/or Production Manual*, and monitoring information in the official lease files for our sample of 48 leases recorded as being in suspension as of September 30, 2016. We also interviewed officials from BLM headquarters, as well as BLM's state offices in Montana and Wyoming and the field offices responsible for the 48 selected leases in our review—a total of 12 field offices, 2 from Montana and 10 from Wyoming. We interviewed officials from 11 field offices about the approaches they used to monitor lease suspensions, including the frequency of monitoring and the staff involved.[3] We also interviewed officials at headquarters and state offices to examine the extent to which these approaches provided for oversight of lease suspensions. We compared BLM's actions and documentation with agency guidance, federal regulations, and federal standards for internal control for control activities.[4]

---

[2]GAO, *Standards for Internal Control in the Federal Government,* GAO-14-704G (Washington, D.C.: September 2014).

[3]We reviewed a total of 12 field offices; however, 1 office did not respond to our request for information on monitoring of lease suspensions.

[4]GAO-14-704G.

**Appendix I: Objectives, Scope, and Methodology**

We conducted this performance audit from September 2016 to June 2018 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Bureau of Land Management Oil and Gas Leases, Suspensions, and Acreage, as of September 30, 2016

**Table 1: Bureau of Land Management (BLM) Oil and Gas Recorded Leases, Suspensions, and Acreage, as of September 30, 2016**

| State | Number of leases | Leased acreage | Number of suspensions | Suspended acreage |
|---|---|---|---|---|
| Alabama | 114 | 70,620 | 0 | 0 |
| Alaska | 174 | 1,006,960 | 0 | 0 |
| Arizona | 6 | 12,217 | 0 | 0 |
| Arkansas | 619 | 416,194 | 138 | 147,990 |
| California | 530 | 198,820 | 27 | 20,870 |
| Colorado | 4,135 | 3,099,068 | 180 | 236,901 |
| Idaho | 15 | 19,852 | 0 | 0 |
| Illinois | 8 | 1,581 | 0 | 0 |
| Indiana | 8 | 11,358 | 0 | 0 |
| Kansas | 462 | 120,151 | 0 | 0 |
| Kentucky | 69 | 38,073 | 4 | 7,516 |
| Louisiana | 578 | 349,457 | 2 | 133 |
| Maryland | 4 | 2,637 | 0 | 0 |
| Michigan | 235 | 129,769 | 0 | 0 |
| Mississippi | 630 | 351,925 | 2 | 1,025 |
| Montana | 2,751 | 2,145,774 | 607 | 992,145 |
| Nebraska | 27 | 10,442 | 0 | 0 |
| Nevada | 731 | 1,385,511 | 10 | 13,663 |
| New Mexico | 8,021 | 4,508,477 | 158 | 84,256 |
| New York | 5 | 1,183 | 0 | 0 |
| North Dakota | 1,854 | 889,427 | 88 | 68,345 |
| Ohio | 259 | 55,847 | 0 | 0 |
| Oklahoma | 1,209 | 250,358 | 2 | 440 |
| Oregon | 111 | 187,197 | 105 | 172,759 |
| Pennsylvania | 75 | 9,954 | 0 | 0 |
| South Dakota | 383 | 168,938 | 0 | 0 |
| Tennessee | 2 | 736 | 1 | 620 |
| Texas | 676 | 406,733 | 7 | 12,288 |
| Utah | 3,045 | 2,984,294 | 731 | 1,054,288 |
| Virginia | 38 | 27,509 | 0 | 0 |

**Appendix II: Bureau of Land Management Oil and Gas Leases, Suspensions, and Acreage, as of September 30, 2016**

| State | Number of leases | Leased acreage | Number of suspensions | Suspended acreage |
|---|---|---|---|---|
| West Virginia | 242 | 100,917 | 0 | 0 |
| Wyoming | 13,996 | 9,195,483 | 687 | 568,775 |
| **Total** | **41,003** | **28,157,462** | **2,749** | **3,382,014** |

Source: GAO analysis of BLM data. | GAO-18-411

Note: We reviewed BLM data to identify leases and suspensions and associated acreage for all states with BLM leases.

# Appendix III: Bureau of Land Management Oil and Gas Leases Recorded as in Suspension

**Table 2: Bureau of Land Management (BLM) Oil and Gas Leases Recorded as in Suspension by Length and State, as of September 30, 2016**

| State | < 3 years | ≥ 3 years to < 10 years | ≥ 10 years to < 20 years | ≥ 20 years to < 30 years | ≥ 30 years | Total |
|---|---|---|---|---|---|---|
| Arkansas | 11 | 125 | 0 | 2 | 0 | **138** |
| California | 22 | 2 | 1 | 2 | 0 | **27** |
| Colorado | 59 | 113 | 5 | 0 | 3 | **180** |
| Kentucky | 0 | 0 | 0 | 4 | 0 | **4** |
| Louisiana | 0 | 1 | 1 | 0 | 0 | **2** |
| Mississippi | 1 | 0 | 0 | 1 | 0 | **2** |
| Montana | 12 | 167 | 1 | 3 | 424 | **607** |
| North Dakota | 66 | 22 | 0 | 0 | 0 | **88** |
| New Mexico | 49 | 15 | 4 | 11 | 79 | **158** |
| Nevada | 2 | 1 | 3 | 4 | 0 | **10** |
| Oklahoma | 0 | 2 | 0 | 0 | 0 | **2** |
| Oregon | 105 | 0 | 0 | 0 | 0 | **105** |
| Tennessee | 0 | 0 | 1 | 0 | 0 | **1** |
| Texas | 0 | 6 | 1 | 0 | 0 | **7** |
| Utah | 160 | 326 | 111 | 29 | 105 | **731** |
| Wyoming | 142 | 374 | 67 | 70 | 34 | **687** |
| **Total** | **629** | **1,154** | **195** | **126** | **645** | **2,749** |

Source: GAO analysis of BLM data. | GAO-18-411

Note: We reviewed BLM data to identify the length of suspensions for all states with suspended leases. We calculated the length of a lease suspension based on when the suspension was first issued through the end of fiscal year 2016—September 30, 2016.

# Appendix IV: Comments from the Department of the Interior



## United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC  20240

**MAY 2 2 2018**

Mr. Frank Rusco
Director
Natural Resources and Environment
U.S. Government Accountability Office
441 G Street NW
Washington, DC 20548

Dear Mr. Rusco:

Thank you for giving the Department of the Interior the opportunity to review and comment on the Government Accountability Office's (GAO) draft report entitled, *Oil and Gas Lease Management: BLM Could Improve Oversight of Lease Suspensions with Better Data and Monitoring Procedures* (GAO-18-411).

The draft report includes four recommendations for the Bureau of Land Management (BLM). The Department generally agrees with the overall findings of the draft report and concurs with all four recommendations included in the report.  A summary of BLM's responses and plans for addressing the recommendations are provided below.

**Recommendation 1:  As BLM updates or replaces its database, the Director of BLM should include a data field to record the reasons for suspensions.**

**Response:**  The BLM concurs with this recommendation.  While the current version of the BLM's Legacy Rehost 2000 (LR2000) database includes an action remarks field that used to record the reasons for lease suspensions, BLM agrees that any electronic database to track information on oil and gas lease suspensions should include a data field to more explicitly record the reasons for suspensions.

**Recommendation 2:  The Director of BLM should develop official agency procedures for monitoring oil and gas lease suspension, including when to conduct monitoring activities.**

**Response:**  The BLM concurs with this recommendation.  The BLM will develop improved and standardized procedures for monitoring oil and gas lease suspensions, which will be applied consistently across the Bureau.  The BLM will implement these improved lease suspension monitoring practices through written policy and update handbooks as necessary to provide practical implementation guidance.

**Recommendation 3:  The Director of BLM should require cognizant officials in
headquarters and state offices to conduct top-level reviews of field offices'
monitoring of oil and gas lease suspension, as well as official lease files and
databases to ensure they are current and complete.**

**Response:**  The BLM concurs with this recommendation.  The BLM's Washington
Office and National Operations Center currently use a "DataFlux" tool, which
compares LR2000 data with the existing data standard and business rules, to generate
reports generally regarding each BLM state's LR2000 data accuracy, completeness,
consistency, and validity, to include oil and gas lease suspensions.

In addition to using the DataFlux tool to review the quality of electronic data on
lease suspensions, BLM will also update H-3103-1, the *Fees, Rentals, and Royalty*
handbook and develop online training for lease suspensions to provide updated
guidance and training resources to assist the state and field offices in managing,
monitoring, and reviewing lease suspensions.

**Recommendation 4:  As BLM updates or replaces LR2000, the Director of BLM
should ensure the development mechanisms, such as standardized summary
reports on lease suspensions, to assist cognizant officials in headquarters and
state offices with oversight of field offices' monitoring efforts.**

**Response:**  The BLM concurs with this recommendation.  The BLM will update and
improve its LR2000 reporting capabilities by developing a standardized report for oil
and gas leases in a suspended status.  When BLM updates or replaces LR2000, BLM
will also ensure that any data system updates or replacements include the capability
to create standardized reports for oil and gas lease suspension data.

If you have any questions about this response, please contact Timothy Spisak, Acting
Assistant Director – Energy, Minerals and Realty Management at (202) 208-4201, or
Tiya Samuels, Chief – Division for Evaluations and Management Services at
(202) 912-7090.

Sincerely,

Joseph R. Balash
Assistant Secretary
Land and Minerals Management

# Appendix V: GAO Contact and Staff Acknowledgments

## GAO Contact

Frank Rusco, (202) 512-3841 or ruscof@gao.gov

## Staff Acknowledgments

In addition to the contact named above, Dan Haas (Assistant Director), Karla Springer (Assistant Director), John C. Johnson (Analyst-in-Charge), Richard Burkard, Cindy Gilbert, John W. Hocker, Cynthia Norris, Daniel Purdy, Stuart Ryba, Sara Sullivan, Kiki Theodoropoulos, Barbara Timmerman, Jack Wang, and Khristi Wilkins made key contributions to this report.

| | |
|---|---|
| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (https://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to https://www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact: Website: https://www.gao.gov/fraudnet/fraudnet.htm Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.