Stephen H.M. Bloch (UT #7813)
Landon Newell (UT #14738)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
landon@suwa.org

Attorneys for Plaintiffs
Living Rivers and Southern Utah Wilderness Alliance

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## SOUTHERN REGION OF THE CENTRAL DIVISION

| | |
|---|---|
| LIVING RIVERS et al., | **OPPOSITION TO DEFENDANTS' MOTION TO DISMISS ACTION** |
| Plaintiffs, | |
| v. | Case No. 4:19-cv-00057-DN-PK |
| KENT HOFFMAN et al., | Judge David Nuffer |
| Defendants. | Magistrate Judge Paul Kohler |

## INTRODUCTION

Plaintiffs Living Rivers and Southern Utah Wilderness Alliance (collectively, "SUWA") respectfully submit this Opposition to Defendants Kent Hoffman, the Department of the Interior, and Bureau of Land Management's (collectively, "BLM") Motion to Dismiss ("Motion").[1]

This case challenges BLM's failure to comply with the National Environmental Policy Act ("NEPA") when it decided to suspend sixty-eight improperly issued oil and gas leases located in Utah's San Rafael Desert and remarkable public lands near Moab. BLM's suspension

---

[1] *See generally* Defs.' Mot. to Dismiss Action (ECF No. 16)

decisions were not a foregone conclusion. While the agency had the discretion to suspend the leases, it also had the discretion to cancel them outright. Rather than consider cancelling the leases, which would have freed thousands of acres of wilderness-quality lands from the encumbrance of oil and gas leases, BLM chose to suspend the leases and thus left the door to development wide open without any NEPA review.

In its Motion, BLM seeks to insulate its suspension decisions from judicial review by portraying lease suspension as the "beneficial" choice. The agency argues that oil and gas lease suspension decisions forestall development, and thus are not subject to NEPA. But BLM ignores Tenth Circuit law to the contrary, as well as the agency's own NEPA guidance expressly subjecting lease suspension decisions to NEPA.

BLM also argues that SUWA lacks Article III standing to bring this case because the agency's suspension decisions, as it sees them, caused no harm. However, BLM fails to recognize the procedural nature of a NEPA violation. Because the agency failed to comply with NEPA, it made an uninformed decision that increases the likelihood of environmentally harmful development. This amounts to an injury for the purpose of Article III standing. An order by this Court in SUWA's favor would redress the resulting harm by requiring BLM to comply with NEPA and make informed decisions to suspend—or cancel—the leases. As such, this Court has subject matter jurisdiction over this case and BLM's Motion should be denied.

# LEGAL BACKGROUND

## I.      Lease Suspension and Cancellation

BLM manages onshore oil and gas development through a three-stage process: (1) land use planning, (2) leasing, and (3) approval of drilling proposals.[2] BLM's issuance of oil and gas leases that allow surface development (such as the leases at issue here) marks the point at which the agency irretrievably commits land to oil and gas development and can no longer "prevent the impacts from surface use" of the parcel.[3]

However, the Mineral Leasing Act and its regulations grant BLM the discretion to suspend oil and gas leases. BLM's leasing regulations provide that the agency may direct "[a] suspension of all operations and production . . . in the interest of conservation of natural resources."[4] Doing so extends the ten-year lease term, "and no lease shall be deemed to expire during any suspension."[5]

BLM can also cancel leases.[6] This is a far different action from suspension. Whereas a lease suspension essentially pauses the ten-year term of the lease and can be lifted by the agency, cancellation removes the lease interest from the land. Cancellation both eliminates the leaseholder's right to develop the lease, and allows BLM to manage the unencumbered lands for other resource values that might have conflicted with oil and gas development such as wilderness

---

[2] *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 54 (D.D.C. 2019) (describing this three-stage process in more detail).
[3] *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009).
[4] 43 C.F.R. § 3103.4-4(a)
[5] *Id.* § 3103.4-4(b).
[6] *See Boesche v. Udall*, 373 U.S. 472, 481 (1963) (holding that the Mineral Leasing Act "expand[ed]" the agency's ability "to cancel leases issued through administrative error.").

3

values and primitive recreation.[7] Lease cancellation is especially relevant when, as here, the agency's decision to offer the leases for oil and gas development in the first instance violated the law. Mineral Leasing Act regulations contemplate that "[l]eases shall be subject to cancellation if improperly issued."[8]

## II.    The National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment."[9] It "requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives."[10] To comply with NEPA, and before authorizing a proposal, a federal agency must prepare an environmental impact statement ("EIS"), environmental assessment ("EA"), or a categorical exclusion ("CX").[11]

An EIS is a "detailed statement" that must, among other things, rigorously explore and objectively evaluate all reasonable alternatives and analyze all direct, indirect, and cumulative impacts.[12] If it is not "immediately apparent" whether the agency action will have a significant effect on the environment, "the agency must prepare an EA" to determine whether an EIS is necessary.[13] An EA must include a discussion of alternatives and the environmental impacts of

---

[7] *See Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983) ("once the land is leased [BLM] no longer has the authority to *preclude* surface disturbing activities even if the environmental impact of such activity is significant.")

[8] 43 C.F.R. § 3108.3(d) ("Leases shall be subject to cancellation if improperly issued.").

[9] 40 C.F.R. § 1500.1.

[10] *New Mexico ex rel. Richardson*, 565 F.3d at 703.

[11] *See* 40 C.F.R. §§ 1508.4, 1508.9, 1508.11. *See also Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 482 (D.D.C. 1994) ("If an agency chooses not to prepare an [EIS] and does not invoke a [CX], the agency is required to prepare an [EA] to determine whether an [EIS] is necessary.").

[12] 42 U.S.C. § 4332(2)(C). *See also* 40 C.F.R. §§ 1502.14, 1502.16.

[13] *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1251 (10th Cir. 2019) (citations omitted).

the action.[14] If an agency decides not to prepare an EIS, the EA must "provide sufficient evidence" to support a Finding of No Significant Impact.[15]

If an agency decides not to prepare an EIS or EA, it must then prepare a CX.[16] "[CX] means a category of actions which do not individually or cumulatively have a significant effect on the human environment . . . and for which, therefore, neither an [EA] nor an [EIS] is required."[17] "A CX is a form of NEPA compliance, without the analysis that occurs in an EA or EIS. It is *not* an exemption from the NEPA."[18] Before authorizing any action that is subject to a CX, a federal agency "shall provide for [consideration of] extraordinary circumstances in which a normally excluded action may have a significant environmental effect."[19] The Department of the Interior has promulgated twelve "extraordinary circumstances" that its agencies must consider.[20] "If 'extraordinary circumstances' are present, further analysis and environmental documents must be prepared [i.e., an EA or EIS] and the use of a categorical exclusion is inappropriate."[21]

According to BLM's internal NEPA guidance, an oil and gas lease suspension decision is subject to NEPA procedures—specifically a CX.[22] Before BLM approves a suspension decision, the "list

---

[14] *See* 40 C.F.R. § 1508.9.
[15] *Id.* § 1508.9(a)(1).
[16] *Id.* § 1508.4.
[17] *Id.*
[18] BLM, National Environmental Policy Act, Handbook H-1790-1, § 4, pg. 17 (Jan. 2008) (emphasis added) [hereinafter, "NEPA Handbook"] (excerpts attached as Ex. A). The complete NEPA Handbook is available at https://www.ntc.blm.gov/krc/uploads/366/NEPAHandbook_H-1790_508.pdf (last visited Oct. 31, 2019).
[19] 40 C.F.R. § 1508.4.
[20] 43 C.F.R. § 46.215.
[21] *W. Watersheds Project v. Jewell*, 221 F. Supp. 3d 1308, 1313 (D. Utah 2016).
[22] *See* Dept. of the Interior, Dept. Manual Part 516, Chapter 11.9.B(4), pg. 8 (May 8, 2008) [hereinafter, "Department Manual"] (excerpts attached as Ex. B); NEPA Handbook, App. 4, § B.4, pg. 147 (same). The complete Department Manual is available at https://www.doi.gov/nepa/requirements-guidance/DOI-requirements (follow hyperlink for "516 DM 11") (last visited Oct. 31, 2019).

of 'extraordinary circumstances' . . . must be reviewed for applicability."[23] And "[i]f a CX does not pass the 'extraordinary circumstances' test, the proposed action analysis defaults to either an EA or EIS."[24]

## FACTUAL BACKGROUND

The facts of this case are straightforward. BLM issued sixty-eight oil and gas leases in Utah at its March 2018 and September 2018 lease sales.[25] The leases encumber wild, scenic, and culturally significant public lands in Utah. This includes the Goldbar Canyon, Hatch Canyon, Labyrinth Canyon, San Rafael River, and Sweetwater Reef lands with wilderness characteristics areas.[26] BLM has identified these areas as containing wilderness values, meaning they appear natural and undisturbed, and provide outstanding opportunities for solitude and primitive types of recreation such as camping, hiking, and sightseeing. SUWA has worked for years to protect these places from oil and gas leasing and development and to secure permanent protection for their remarkable values.[27]

When BLM issued the sixty-eight leases, it failed to quantify the reasonably foreseeable effects of greenhouse gas emissions from their development. In light of the District Court for the District of Columbia's decision in *WildEarth Guardians v. Zinke*,[28] BLM determined that the leases had been improperly issued.[29] SUWA had already appealed both lease sales to the Interior Board of Land Appeals ("IBLA") on this very ground.[30]

---

[23] Department Manual § 11.9, pg. 7.
[24] *Id.*
[25] Compl. ¶¶ 1-8, 49-57 (ECF No. 2).
[26] *See* Decl. of Ray Bloxham ¶¶ 9-12 (attached as Ex. C).
[27] *Id.*
[28] 368 F. Supp. 3d 41 (D.D.C. 2019).
[29] *See* Compl. ¶ 51; Motion at 4.
[30] Compl. ¶¶ 49-57.

Soon after the *Zinke* decision, BLM indicated it would be suspending the leases subject to SUWA's IBLA appeal.[31] Counsel for SUWA emailed BLM to remind the agency of its obligation to comply with NEPA *before* it made the suspension decisions.[32] Nonetheless, in June and July of 2019, BLM sent letters to the respective lessees stating that the agency "has concluded that it is necessary to suspend the above-referenced lease until the completion of appropriate review under NEPA."[33] The letters sent to each respective lessee are the only documentation prepared by BLM for its suspension decisions.[34] BLM decided to suspend the leases without first considering whether to cancel them, despite having the authority to do so.[35]

Even though BLM does not allow oil and gas development on suspended leases, its suspension decisions have real world effect, keeping the door open to future development.[36] Suspensions can remain in place for an indefinite period of time—oftentimes for several decades.[37] During this time the leasehold remains, encumbering public lands in a way that significantly restricts SUWA from achieving its goal of securing long-term protection for these public lands.[38]

### STANDARD OF REVIEW

BLM seeks dismissal on two grounds, each of which requires a different standard of review. To start, BLM argues that it was under no obligation to comply with NEPA, and seeks

---

[31] *Id.* ¶¶ 52, 58.
[32] *Id.* ¶ 59.
[33] *Id.* ¶¶ 61, 64.
[34] *See generally* Exs. 1-3 to Motion (ECF Nos. 16-1, 16-2, and 16-3).
[35] 43 C.F.R. § 3108.3(d).
[36] *See Id.* § 3103.4-4(b) ("no lease shall be deemed to expire during any suspension").
[37] *See* Ex. 4 to Compl. at 17 (ECF No. 2-5) (showing that approximately twenty-nine percent of all suspended oil and gas leases have been suspended for more than twenty years).
[38] *See* Decl. of Ray Bloxham ¶¶ 20-31.

dismissal under Federal Rule of Civil Procedure 12(b)(6). Such a motion tests whether SUWA's pleading contains "a short and plain statement of the claim showing that the pleader is entitled to relief."[39] In considering a motion to dismiss for failure to state a claim, a court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiffs."[40] To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."[41] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[42] "Although 'specific facts are not necessary' to comply with Rule 8(a)(2), the complaint must 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"[43]

BLM also seeks dismissal under Federal Rule of Civil Procedure 12(b)(1) on the ground that SUWA lacks standing. "When evaluating a plaintiff's standing at the stage of a motion to dismiss on the pleadings, 'both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'"[44] Courts also "must construe the statements made in the affidavits in the light most favorable to the petitioner."[45] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court]

---

[39] Fed. R. Civ. P. 8(a)(2). *See also* *Pueblo of Jemez v. United States,* 790 F.3d 1143, 1171 (10th Cir. 2015) (same).

[40] *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., Colo.,* 771 F.3d 697, 700 (10th Cir. 2014) (quotation omitted).

[41] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotation omitted).

[42] *Id.*

[43] *Burnett v. Mortg. Elec. Registration Sys., Inc.,* 706 F.3d 1231, 1235 (10th Cir. 2013) (quoting *Erickson v. Pardus,* 551 U.S. 89, 93 (2007)) (internal quotations and alterations omitted).

[44] *S. Utah Wilderness All. v. Palma,* 707 F.3d 1143, 1152 (10th Cir. 2013) (quoting *Warth v. Seldin,* 422 U.S. 490, 501 (1975)).

[45] *Palma,* 707 F.3d at 1152 (quoting *Initiative & Referendum Inst. v. Walker,* 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc)).

presume[s] that general allegations embrace those specific facts that are necessary to support the claim."[46]

## ARGUMENT

## I.   BLM'S LEASE SUSPENSION DECISIONS ARE SUBJECT TO NEPA.

NEPA requires "all agencies of the Federal Government" to comply with its provisions "to the fullest extent possible" when taking "major Federal actions significantly affecting the quality of the human environment."[47] Congress' directive that agencies comply with NEPA to the fullest extent possible "is neither accidental nor hyperbolic.  Rather, the phrase is a deliberate command that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle."[48]

"Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."[49] These include "proposals" for major federal action.[50] NEPA's implementing regulations define a "proposal" broadly as "that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated."[51]

BLM's lease suspensions decisions are just such actions. As discussed above, BLM issued the oil and gas leases here without quantifying reasonably foreseeable greenhouse gas emissions. Thus, following the decision in *Zinke*, the leases were issued without full compliance

---

[46] *Id.*  (internal alterations and citations omitted).
[47] 42 U.S.C. § 4332(2)(C).
[48] *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 788 (1976).
[49] 40 C.F.R. § 1508.18.
[50] 42 U.S.C. § 4332(2)(C).
[51] 40 C.F.R. § 1508.23.

with NEPA. This rendered the leases "subject to cancellation" under BLM's oil and gas leasing regulations.[52]

Of course, BLM has the authority to suspend leases. SUWA does not contest this point. What matters here is that BLM had other options; and faced a discretionary choice of whether to suspend or cancel the leases. In the language of NEPA's implementing regulations, BLM was "actively preparing to make a decision on one or more alternative means of accomplishing [its] goal" of remedying improperly issued leases.[53] The agency was thus required to comply with NEPA by preparing an EIS or EA in which it considered the environmental consequences of its decision, or a CX in which it determined whether any extraordinary circumstances warranted preparation of an EA or EIS.

BLM seeks 12(b)(6) dismissal solely on the basis of its proposition "that agency actions which are environmentally neutral, maintain the status quo, or are environmentally beneficial do not constitute a major federal action requiring NEPA compliance."[54] This argument fails for two reasons. First, BLM's argument is inconsistent with Tenth Circuit law and contradicts NEPA regulations and the agency's own guidance and past practice. Second, BLM's suspension decisions were not the environmentally beneficial choice here. Rather than cancel the improperly issued leases, BLM decided to simply press the pause button, increasing the likelihood of future oil and gas development.

---

[52] 43 C.F.R. § 3108.3(d) ("Leases shall be subject to cancellation if improperly issued.").
[53] 40 C.F.R. § 1508.23.
[54] Motion at 14.

**A.  The Tenth Circuit Has Not Foreclosed SUWA's Claim for Relief.**

Despite its citations to *Iqbal* and *Twombly*, BLM's 12(b)(6) motion to dismiss does not challenge the facial plausibility of SUWA's Complaint—that is, whether SUWA has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[55] Instead, it raises a purely legal argument that NEPA does not apply to "beneficial" agency actions writ-large.

BLM's argument is simply wrong. The Tenth Circuit has recognized that environmentally beneficial actions can trigger an agency's duties under NEPA. In *Catron County Board of Commissioners v. U.S. Fish & Wildlife Service*, for instance, the court held that an agency's decision to designate critical wildlife habitat under the Endangered Species Act was subject to NEPA review.[56] In reaching its holding, the court recognized that whether an agency believes its decision will be beneficial is "immaterial to [its] responsibility to comply with NEPA."[57] As the court explained,

> [t]o interpret NEPA as merely requiring an assessment of detrimental impacts upon the environment would significantly diminish the act's fundamental purpose—to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."[58]

BLM does not cite to *Catron County* (or any binding law) to support its Rule 12(b)(6) argument. Instead, it relies on dicta in a footnote in *Utah Shared Access Alliance v. Carpenter*.[59]

---

[55] *Iqbal*, 556 U.S. at 678.
[56] 75 F.3d 1429, 1439 (10th Cir. 1996).
[57] *Id.* at 1437. *See also* 40 C.F.R. § 1508.27(b)(1) ("A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.").
[58] *Catron Cty.*, 75 F.3d at 1437 (citing 40 C.F.R. § 1500.1(c)).
[59] 463 F.3d 1125, 1136 n.4 (10th Cir. 2006).

In the footnote, the Tenth Circuit only "note[s] that some courts have concluded that actions taken to protect the environment need not be predicated by an EA or EIS."[60]

BLM's reliance on this footnote is misplaced. First, as mentioned, the *Carpenter* panel's footnote is dicta. The court held in that case that BLM did not need to undertake a land use plan amendment before imposing temporary off-road vehicle closures. As a consequence, BLM did not need to prepare a NEPA document that would necessarily accompany that amendment. Though the court noted the beneficial effect of the closure, it "decline[d] to address the issue" here: whether the closure "constitute[d] either a 'proposal' or a 'major Federal action'" for NEPA purposes.[61]

Second, the footnote refers to the Ninth Circuit's decision in *Douglas County v. Babbitt*, a case—like *Catron County*—challenging an agency's failure to comply with NEPA when making a critical habitat designation.[62] In *Douglas County*, the Ninth Circuit held that critical habitat designations did not require NEPA compliance in part because designation was protective, and "does not alter the natural, untouched physical environment at all."[63] But the Tenth Circuit in *Catron County* came to the opposite conclusion and, in so doing, rejected the reasoning in *Douglas County*—the reasoning on which BLM now relies.[64] BLM relies on unhelpful dicta to support its Rule 12(b)(6) motion, while ignoring Tenth Circuit authority

---

[60] *Id.*

[61] *Id.*

[62] 48 F.3d 1495, 1505 (9th Cir. 1995).

[63] *Id.*

[64] *Catron Cty.*, 75 F.3d at 1436. Both *Catron County* and *Douglas County* were decided on motions for summary judgment, not motions to dismiss, suggesting that BLM's argument here is not proper grounds for a 12(b)(6) motion. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) ("Determination of whether the agency complied with prescribed procedures requires a plenary review of the record and consideration of applicable law.").

recognizing that an agency cannot avoid its NEPA obligations solely because it considers its action to be beneficial.

Indeed, BLM's argument contradicts its own NEPA guidance. BLM's NEPA Handbook—its internal guidance for NEPA compliance—directs that "[a]s a Federal agency, the BLM must meet NEPA requirements whenever it is the BLM's decision that would result in an effect on the human environment, *even when the effect would be beneficial* and regardless of who proposes the action or where it would take place."[65]

Furthermore, the agency has explicitly designated oil and gas lease suspensions as subject to a CX. As discussed above, "[a] CX is a form of NEPA compliance, without the analysis that occurs in an EA or EIS. *It is not an exemption from the NEPA*."[66] BLM's list of agency-created CXs includes in its oil and gas section the "[a]pproval of . . . suspensions of operations and production."[67]Accordingly, the Handbook instructs that "the list of 'extraordinary circumstances' . . . must be reviewed for applicability" to determine whether BLM can use a CX to approve lease suspensions, or whether it must instead prepare an EA or EIS.[68] BLM field offices outside of Utah routinely follow this very procedure prior to issuing lease suspension decisions.[69]

---

[65] NEPA Handbook § 3.1, pg. 13 (citing 40 C.F.R. § 1508.18) (emphasis added).

[66] *Id.* § 4, pg. 17 (emphasis added).

[67] *Id.* at App. 4, § B.4, pg. 147. *See also* Department Manual § 11.9.B(4), pg. 8 (same).

[68] NEPA Handbook at App. 4, pg. 147. *See also W. Watershed Project*, 221 F. Supp. 3d at 1313 (same); 40 C.F.R. § 1508.4 (same).

[69] *See, e.g.*, BLM, Categorical Exclusion, DOI-BLM-CO-S050-2015-0042 CX, Suspension of Operations of 11 Oil and Gas Leases: COC-13483, COC-16076, COC-42314, COC-68787, COC-68788, COC-68789, COC-68790, COC-68791, COC-69066, COC-70004 and COC-70005 (June 2015); BLM, Categorical Exclusion, DOI-BLM-CO-S050-2015-0054 CX, Extension of Suspension of Operations and Production Federal Oil and Gas Leases COC-63886, COC-63888, COC-63889, and COC-64169 (Sept. 2015); BLM, Categorical Exclusion, DOI-BLM-CO-S010-2019-0009-CX, Suspension of Operations and Production for COC-70204 (May 2019) (CXs attached as Ex. D). SUWA submits these records only to show that BLM's Rule 12(b)(6) argument lacks merit, not to convert this motion into one for summary judgement. Though not a part of the record in the case, the Court may take judicial notice of these and other attachments to this Opposition because they are official government documents. *See*

BLM argues—without support—that its suspension decisions were not subject to a CX because, its counsel contends, "use of the word 'approval' indicates an intention that this CX is limited to those situations where a suspension is requested by a lessee."[70] But its argument contradicts the well-established requirement that NEPA applies equally to federal and non-federal proposals.[71] And if this were truly the case, BLM's Utah files would be replete with examples of CX approvals of lessee-requested suspensions when in fact there are none.[72] BLM's argument is nothing more than an attempt to sidestep its own NEPA guidance requiring that it prepare, at a minimum, a CX when making lease suspensions decisions.

### B.  Lease Suspension Was Not the Environmentally Beneficial Choice Here.

Even assuming that NEPA does not apply to "beneficial" or "status quo" actions, lease suspension decisions increase, rather than decrease, the risk of harm from oil and gas development. As discussed above, BLM had at least two options—suspension or cancellation—for how to address improperly issued leases. As BLM recognizes, suspensions leave the leases on the books—BLM need only lift the suspensions and a lessee may proceed with its plans to develop its lease.[73] Leases cannot expire while suspended, and the ten-year lease term tolls.[74]

---

[70] Motion at 15-16.

[71] *See* NEPA Handbook § 3.1, pg. 13 (NEPA applies "regardless of who proposes the action"). *See also* 40 C.F.R. § 1508.18(a) (defining "actions" broadly to include "new and continuing activities . . . projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by federal agencies"); *id.* § 1508.23 (defining "proposal" broadly to include any "action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal").

[72] Utah-BLM has never prepared a CX for an oil and gas lease suspension requested by the lessee, even though it has received and approved hundreds of such requests. *See, e.g.*, Utah-BLM Letter to Wapiti Operating, LLC, Re: Request for Suspension of Operations and Production (July 15, 2014) (approving the requested suspensions without preparing, at a minimum, a CX or considering whether extraordinary circumstances existed); Utah-BLM Letter to Foundation Energy Mgmt., L.P., Re: Request for Suspension of Operations and Production (June 10, 2013) (same); Utah-BLM Letter to Sego Resources, Re: Request for Suspension of Operations and Production (March 4, 1999) (same); Utah-BLM Letter to Exxon Co., U.S.A., Re: Suspensions of Operations and Production (Oct. 17, 1995) (same) (letters collectively attached as Ex. E).

[73] Motion at 15.

[74] 43 C.F.R. § 3103.4-4(b).

Moreover, the lands remain encumbered by the lease and committed to development, thus making it less likely Congress will designate the lands as Wilderness and, as a practical matter, hindering BLM from managing the lands for conservation.[75]

Lease cancellation, on the other hand, would eliminate the looming possibility of oil and gas development. The lands would no longer be burdened by a lease interest. BLM would be free to manage the lands, many of which possess wilderness characteristics, without regard to any existing commitments to industrialize the lands for oil and gas development. Thus, BLM's assurance that its suspension decision "is at the very least environmentally neutral, if not environmentally beneficial" is an empty platitude.[76]

In sum, BLM's sweeping Rule 12(b)(6) argument—that actions it considers beneficial are, as a matter of course, not subject to NEPA—lacks legal support. Moreover, BLM's suspension decisions were not "beneficial." Rather, and in contrast to cancellation, its decisions extended the duration of the leases, increased the likelihood that harmful development will occur, and discouraged environmentally protective designations and management. SUWA has stated a claim upon which relief can be granted, and BLM's motion should be denied.

---

[75] *See* Decl. of Ray Bloxham ¶¶ 20-31 (explaining that the existence of oil and gas leases—including suspended leases—has prohibited SUWA from protecting the lands at issue in this litigation).

[76] After SUWA brought this action, BLM submitted a declaration by Kent Hoffman, the Deputy State Director of BLM's Division of Lands and Minerals. Ex. 4 to Motion (ECF No. 16-4). In his declaration, signed the day before BLM filed its motion to dismiss, Mr. Hoffman asserts that BLM will, after additional NEPA review, "take one of the following actions: (1) lift the lease suspension; (2) modify lease terms and lift the suspension; or (3) void the lease." *Id.* at ¶ 4. But Mr. Hoffman's declaration looks past BLM's suspension decision at issue here and its attendant duty to, at the very least, prepare a CX and evaluate whether extraordinary circumstances might apply.

II.     **SUWA HAS ARTICLE III STANDING TO CHALLENGE BLM'S LEASE SUSPENSION DECISIONS.**

In addition to its Rule 12(b)(6) motion, BLM seeks dismissal under Rule 12(b)(1) for

lack of Article III standing. To satisfy Article III's standing requirements, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[77]

SUWA meets all three requirements.

### A. Injury in Fact

As the Tenth Circuit explained in *Committee to Save the Rio Hondo v. Lucero*, in

determining whether a plaintiff has Article III standing in the NEPA context "it is important to

remember the procedural nature of a [NEPA] claim."[78] Because NEPA does not mandate

particular outcomes but instead requires strict adherence to procedural requirements, "[a]n

agency's failure to follow [NEPA's] prescribed procedures creates a risk that serious

environmental consequences of the agency action will not be brought to the agency

decisionmaker's attention."[79] Accordingly, the Tenth Circuit splits the injury-in-fact prong "into

two parts" for the purpose of NEPA claims:

> (1) the litigant must show that in making its decision without following [NEPA's] procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm; and (2) the litigant must show that the increased risk of environmental harm

---

[77] *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citation omitted).
[78] 102 F.3d 445, 448 (10th Cir. 1996).
[79] *Id.* (internal citations and quotations omitted).

injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action.[80]

Because BLM failed to conduct NEPA when deciding what course of action to take regarding the leases at issue here, it made uninformed decisions that threaten environmental harm to SUWA's concrete interests.

        i.    <u>BLM Created an Increased Risk of Harm by Failing to Comply with NEPA.</u>

Faced with the choice between suspending and cancelling its improperly issued leases, BLM proceeded directly to issuing lease suspensions without first complying with NEPA. Consequently, its decisions were "uninformed" and "create[d]" the injury in fact for purposes of Article III standing—the "injury of an increased risk of harm."[81]

As discussed above, BLM was not required to suspend the leases at issue in this litigation, and could have instead cancelled them.[82] These two outcomes (keeping leases on the books versus lease cancellation) have significantly different real-world effects and significantly different environmental impacts. Public lands can only be developed for oil and gas with a valid existing lease.[83] By suspending the leases, BLM has kept the door open to future development. Cancellation, on the other hand, would have eliminated the potential for development and

---

[80] *Id.* at 449.

[81] *Id.*

[82] *See* 43 C.F.R. § 3108.3(d) ("Leases shall be subject to cancellation if improperly issued."); *id.* § 3103.4-4(a) ("A suspension of all operations and production *may* be directed or consented to by [BLM] only in the interest of conservation.") (emphasis added).

[83] *See also Sierra Club*, 717 F.2d at 1414 ("[O]nce the land is leased [BLM] no longer has the authority to *preclude* surface disturbing activities even if the environmental impact of such activity is significant"); 43 C.F.R. § 3101.1-2 ("A lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in the leasehold"). *See also* Decl. of Ray Bloxham ¶¶ 32-37 (describing the harms to his, and SUWA's, interests from existing oil and gas leases).

allowed for environmentally-protective designations and management decisions.[84] But BLM failed to consider these differences. Instead, in two-page letters to the lessees, BLM merely stated that it had decided to suspend the leases based on the similarities between certain pending legal challenges (SUWA's IBLA appeals) and the *Zinke* decision.[85]

Because BLM did not comply with NEPA, there is no evidence that the agency even considered whether to cancel the leases, let alone the consequences of doing so. Such uninformed decisionmaking is precisely the injury NEPA is designed to prevent. It is immaterial that BLM—had it considered this information—*may* have reached the same conclusion to issue the suspension decisions. For purposes of standing, a plaintiff "need not establish that the ultimate agency decision would change upon [NEPA] compliance."[86]

According to BLM, "suspension effectively prohibits any ground disturbing activities or development, thus negating any potentially-related environmental harm."[87] This contention is wrong as a matter of fact. As discussed above, suspension keeps the door to development open, and only lengthens the term of the lease. BLM's contention also misses the point that the agency had the option to cancel the leases, which would have resolved *all* of SUWA's alleged harms.

For this same reason, BLM's reliance on *Moyle Petroleum v. LaHood* is inapposite.[88] In that case, the court held that the plaintiff had not shown how the rerouting of a proposed highway interchange would improve air quality (*i.e.*, under both interchange scenarios the air quality impact would be the same), and thus the plaintiff failed to satisfy the first prong of the injury-in

---

[84] *See* Decl. of Ray Bloxham ¶¶ 20-31 (detailing how the existence of leases has prevented SUWA from achieving wilderness protections for the leased lands).
[85] Exs. 1-3 to Motion.
[86] *Rio Hondo*, 102 F.3d at 452.
[87] Motion at 9.
[88] *See id.* at 8-9.

fact test.[89] In contrast, here the potential outcomes (and accompanying environmental effects) of keeping the leases in existence by suspending them, compared to cancelling them, are not the same. The former keeps the door open to oil and gas development on the leases while the latter closes that door.

BLM's argument also overlooks the procedural nature of SUWA's alleged NEPA violation and Tenth Circuit precedent. In *Rio Hondo*, the Tenth Circuit held that the plaintiffs had standing to challenge a decision by the United States Forest Service to allow summertime use of a ski area.[90] The plaintiffs alleged that the Forest Service had failed to prepare a sufficient NEPA analysis prior to allowing that use.[91] Discussing Article III standing, the *Rio Hondo* court explained that the Forest Service's alleged procedural misstep created "a risk that serious environmental consequences of the agency action [were] not . . . brought to the agency decisionmaker's attention."[92] Stated differently, it was the Forest Service's uninformed decision, and not actual on-the-ground environmental damage, that injured the plaintiffs.

In light of the procedural nature of NEPA, the court further explained that the plaintiffs did not need "to show with certainty, or even with a substantial probability" that the challenged action would have a significant impact to the environment.[93] Instead, the obligation to make that showing *fell on the agency i.e.*, "those examinations are left to [a NEPA analysis.]"[94]

---

[89] 969 F. Supp. 2d 1332, 1336 (D. Utah 2013) ("Moyle has failed to adequately explain how using an alternative which allows left turns on the 200 West interchange will better the air quality on its property.").
[90] *Rio Hondo*, 102 F.3d at 446.
[91] *Id.* at 446-47.
[92] *Id.* at 448.
[93] *Id.* at 452.
[94] *Id.*

Here too, SUWA challenges BLM's *uninformed* lease suspension decisions. SUWA need not "show with certainty, or even with a substantial probability" that the challenged action would have a significant impact to the environment.[95] It is enough that BLM, by making uninformed decisions, increased the risk of harm to SUWA's interests.

        ii.    <u>SUWA Has Adequately Alleged Harm to its Concrete, Particularized Interests.</u>

"To fully establish injury in fact, a plaintiff must be able to show that a separate injury to its concrete, particularized interests flows from the agency's procedural failure."[96] In the NEPA context, to make this showing a plaintiff "must establish either its 'geographical nexus' to, or actual use of the site where the agency will take or has taken action such that it may be expected to suffer the environmental consequences of the action."[97]

The Tenth Circuit has applied this rule in two recent NEPA cases. In *WildEarth Guardians v. U.S. Bureau of Land Management*, the plaintiffs alleged that BLM failed to properly consider alternatives in violation of NEPA, and that their members had visited the public lands at issue.[98] Similarly, in *Diné Citizens Against Ruining Our Environment v. Bernhardt* ("*Diné CARE*"), the plaintiffs alleged that BLM's consideration of certain oil and gas drilling projects violated NEPA and that their members had visited the public lands at issue.[99] In both instances the Tenth Circuit held that the plaintiffs, based on these facts, had demonstrated

---

[95] *Id.*
[96] *Id.* at 449.
[97] *Id.* (citations omitted).
[98] 870 F.3d 1222, 1231 (10th Cir. 2017).
[99] 923 F.3d 831, 841 (10th Cir. 2019).

the necessary concrete and particularized interest in order to challenge the respective agency decisions.[100]

These cases are controlling here. As discussed above, BLM made uninformed lease suspension decisions that increase the chance that environmentally harmful development will occur. And this risk of harm threatens SUWA's concrete and particularized interests. As described in detail in SUWA's Complaint and the declaration of SUWA's standing declarant, Ray Bloxham, SUWA members have travelled extensively through the public lands encompassed by the suspended leases, worked for decades to achieve permanent protections for the lands at issue, plan to return to these lands, and will be harmed by oil and gas development activity on the leases.[101] In the NEPA context, these facts are sufficient in order for SUWA to establish an injury-in-fact.

BLM relies solely on *Moyle Petroleum* to argue that SUWA lacks a concrete and particularized injury, but that decision is easily distinguishable.[102] There, the court found that the plaintiff lacked standing to challenge a highway interchange revision under NEPA because it did not have a concrete interest in protection of the environment. Its interests were instead "in property access and business revenues from commuter traffic."[103] As a consequence, the court found that its "concerns about environmental harm . . . may be shared by all and are more accurately categorized as general grievances."[104]

---

[100] *WildEarth Guardians*, 870 F.3d at 1232; *Diné CARE*, 923 F.3d at 844.
[101] *See generally* Compl. ¶¶ 19-20; Decl. of Ray Bloxham ¶¶ 13-37.
[102] *See* Motion at 8-9.
[103] 969 F. Supp. 3d at 1336.
[104] *Id.*

In contrast, SUWA has clear and undisputed interests in the *environmental* protection of the very lands at risk here.[105] Because SUWA's challenge is brought in the context of NEPA, it need only show "a geographical nexus to, and actual[] use [of] the land . . . in the affected area" to demonstrate a concrete interest.[106] SUWA has done so here.[107]

### B.  Causation

"To establish causation, a plaintiff must show its injuries are fairly traceable to the conduct complained of."[108] In the NEPA context, "the injury is the increased risk of environmental harm to concrete interests, and the conduct complained of is the agency's failure to follow [NEPA] procedures."[109] "[O]nce the plaintiff has established the likelihood of the increased risk for purposes of injury in fact, to establish causation . . . the plaintiff need only trace the risk of harm to the agency's alleged failure to follow [NEPA's] procedures."[110]

In *WildEarth Guardians*, the court held that plaintiffs had met this low threshold requirement simply by having "pointed out that the increased risk of environmental harm is directly tied to BLM's inadequate alternative comparison."[111] Similarly, in *Diné CARE*, the plaintiffs alleged that BLM's "uninformed decision" to approve certain oil and gas drilling permits had increased the risk of environmental harm—an allegation the Tenth Circuit held was "sufficient to establish causation."[112]

---

[105] *See* Decl. of Ray Bloxham ¶¶ 20-31.
[106] *Rio Hondo*, 102 F.3d at 450.
[107] *See* Decl. of Ray Bloxham ¶¶ 13-19.
[108] *Rio Hondo*, 102 F.3d at 451.
[109] *Id.*
[110] *Id.* at 452.
[111] *WildEarth Guardians*, 870 F.3d at 1231.
[112] *Diné CARE*, 923 F.3d at 844.

SUWA has likewise has cleared this low threshold. As explained above, BLM failed to follow NEPA procedures when they issued the challenged lease suspension decisions.[113] Thus, BLM's uninformed decisions caused SUWA's alleged injuries.

BLM argues that oil and gas lease suspensions can, in certain circumstances, be viewed "favorably."[114] The present suspension decisions, according to Defendants, should be so viewed because they were put into place in order for BLM to "conduct additional NEPA analysis."[115] But it is immaterial whether lease suspensions, considered in the abstract, can serve legitimate purposes. That fact does not address SUWA's complaint that BLM was required to comply with NEPA when it was considering issuing the suspensions themselves, and the failure to do so caused SUWA's members injuries.

## C. Redressability

Finally, SUWA's alleged harms will be redressed by an order from the Court instructing BLM to comply with NEPA. "Compliance with [NEPA] would avert the possibility that [the agency] may have overlooked significant environmental consequences of its action."[116] For this reason, in the NEPA context, "'the normal standards for redressability' are relaxed; a plaintiff need not establish that the ultimate agency decision would change upon [NEPA] compliance,"[117] rather it need only establish "that its injury would be redressed by a favorable decision requiring [the federal agency] to comply with [NEPA's] procedures."[118]

---

[113] Compl. ¶ 20.
[114] Motion at 11.
[115] *Id.*
[116] *Rio Hondo*, 102 F.3d at 452.
[117] *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572, n.7 (1992)).
[118] *Id. See also Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."); *S. Utah Wilderness All. v. Office of*

SUWA meets the redressability requirement. BLM failed to follow NEPA procedures when it issued the challenged lease suspension decisions. SUWA has requested that, on remand, the Court order BLM to "comply with all applicable NEPA procedures" prior to making renewed decisions to cancel or suspend these leases.[119] This would redress SUWA's alleged injuries.[120]

In its Motion, BLM argues that SUWA's requested court order would "would remove the environmental protections currently provided by the lease suspensions."[121] According to BLM, "[w]ithout the suspensions in place, lessees could presumably begin at least some lease development, and [SUWA's] interests to prevent development could consequently be harmed, not protected, by a favorable decision."[122]

Contrary to BLM's claims, the lessees could not immediately "begin at least some lease development" if the suspensions were lifted. At most they could seek approval for drilling operations by filing an application for permit to drill.[123]

More importantly, BLM's argument misses the procedural nature of the injury. SUWA's "alleged injury is the potential environmental impact of [BLM's] uninformed decision."[124] "This injury is redressable by a court order requiring [BLM] to undertake [a] NEPA . . . analysis in

---

*Surface Mining Recl. And Enforcement*, 620 F.3d 1227, 1235 (10th Cir. 2010) (holding that an agency's failure to follow its procedures "also satisfies the . . . redressability prong[]").
[119] Compl. at 20.
[120] *See Diné CARE*, 923 F.3d at 844 ("A favorable decision ordering compliance with NEPA's procedures would 'avert the possibility that the [agency] may have overlooked significant environmental consequences of its actions,' thereby redressing Appellants' alleged harms.") (citation omitted).
[121] Motion at 12.
[122] Motion at 12-13.
[123] 43 C.F.R. § 3162.3-1(c) (stating that "[n]o drilling operations, nor surface disturbance . . . may be commenced prior to the authorized officer's approval of the [drilling] permit").
[124] *Id.* at 1265-66.

order to better inform itself of the consequences of its decision."[125] SUWA's alleged harms will be redressed by an order from the Court instructing BLM to comply with NEPA.

## CONCLUSION

For the foregoing reasons, oil and gas lease suspension decisions are subject to NEPA, and SUWA has standing to challenge BLM's uninformed decisionmaking. BLM's Motion to Dismiss should be denied.


DATED this 1st day of November, 2019.

Respectfully submitted,

/s/ Landon Newell

Landon Newell
Stephen Bloch

---

[125] *Id.* at 1266.