JOHN W. HUBER, United States Attorney (#7226)
JOHN K. MANGUM, Assistant United States Attorney (#2072)
111 South Main Street, #1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Attorneys for the Defendants

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| LIVING RIVERS and SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br>Plaintiffs,<br><br>v.<br><br>KENT HOFFMAN, in his official capacity as Deputy State Director, Division of Lands and Minerals, UNITED STATES DEPARTMENT OF THE INTERIOR; and UNITED STATES BUREAU OF LAND MANAGEMENT,<br><br>Defendants. | Case No. 4:19-cv-00057-DN-PK<br><br>**DEFENDANTS' REPLY SUPPORTING THEIR MOTION TO DISMISS**<br><br>Honorable David Nuffer<br>Magistrate Judge Paul Kohler |

      Defendants respectfully submit this reply memorandum in support of their motion[1] to dismiss this action, and in opposition to the response[2] filed by Plaintiffs.

      As demonstrated in the motion to dismiss, Court lacks subject matter jurisdiction as a result of Plaintiffs' lack of Article III standing. Additionally, Plaintiffs have not shown that they

---

[1] Docket no. 16 filed October 4, 2019.

[2] Docket no. 17 filed Nov. 1, 2019 (the "Opp. Mem.").

state a claim for which any relief can be granted because the lease suspension decisions at issue in this action did not need to be preceded by analysis under the National Environmental Policy Act ("NEPA").

Therefore, as discussed further below, this Court should dismiss this action without prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).

### I.     REPLY TO PLAINTIFFS' DESCRIPTION OF LEGAL AND FACTUAL BACKGROUND

The central and too-oft-repeated but mistaken theme of Plaintiffs' opposition is that the subject leases should have been canceled because they were allegedly improperly issued.[3] This assumed legal conclusion lacks support. To be clear, Defendants have never stated and do not concede that (1) these leases were improperly issued, and (2) even if the Court were to later find that the leases had been improperly issued, that cancellation was required as the only option.

The suspensions each say "[n]o lease operations may transpire on the leases, . . . while this SOP [suspension of operations and production] is in place."[4] Thereby, the suspensions effectively prohibit any ground-disturbing activity on the subject lands, and preserve the status quo, while Defendants complete additional NEPA analyses to consider similar greenhouse gas (GHG) emissions and climate change issues raised by the decision in the separate case of *WildEarth Guardians v. Zinke* [5] concerning BLM-issued leases in Wyoming. That decision was released months after these Utah leases that are the subject of this action had been issued. The *Zinke* decision simply remanded to the Bureau of Land Management (BLM) the Environmental

---

[3] The first two of such claims were made in the Opp. Mem. at 4 and 6.

[4] See, e.g., Docket nos. 16-1 at 2, 16-2 at 2, and 16-3 at 2.

[5] 368 F. Supp. 3d 41 (D.D.C. 2019).

2

Assessments (EAs) and Findings of No Significant Impact (FONSIs) supporting the Wyoming leases so the BLM could complete additional NEPA analyses of potential GHG emissions and climate change effects from the Wyoming leases. The *Zinke* court expressly noted that it was "withholding judgment on whether BLM's leasing decisions were correct" and declined to vacate the Wyoming leases at that stage of the litigation, allowing BLM-Wyoming a further opportunity to show that its leasing decisions were proper.[6] Along these lines, the BLM-Utah determination that it should suspend the leases that are the subject of this action and complete additional NEPA analyses involving potential GHG emissions and climate change effects, and that it was not necessary to cancel the leases, is reasonable. Moreover, BLM may cancel or void the subject leases if it determines that step is appropriate after it completes the additional NEPA analysis it has committed to undertake.

Furthermore, even if BLM had canceled the subject leases, because the lands included in the lease parcels are designated as available for oil and gas leasing and development under the governing land use plan, such cancellation would not necessarily or forever prohibit similar leases being issued in the future for the same locations, if the BLM were to deem such action appropriate. This is a point that Plaintiffs also overlook in their claim that suspension keeps the door open to future development[7] in a manner that they misguidedly first imply and later state[8] cancellation would not allow.

## II.  PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEY HAVE STANDING.

---

[6] *Id.* at 51, 84-85.

[7] Opp. Mem. at 7.

[8] *Id.* and see pp. 17-18 of the Opp. Mem..

3

Plaintiffs attempt to meet the first standing requirement of showing an "increased risk of actual, threatened, or imminent environmental harm"[9] by claiming that suspension keeps the door open to future development while cancellation does not. As briefly explained above, there is no meaningful distinction concerning this standing requirement between a lease suspension which prohibits all ground-disturbing activity and a cancellation of that lease. With respect to the leases that are the subject of this action, lease suspension is equally effective as lease cancellation in preserving the on-the-ground status quo while BLM completes the additional NEPA analyses it has committed to undertake. Cancellations are not an inherently superior means of preventing all future activity.

Plaintiffs attempt to buttress their claim that cancellation would have increased the likelihood of achieving wilderness protections for the subject leased lands by asserting though the supplemental declaration of Ray Bloxham that the existence of these leases contributed to the exclusion of the lands they cover from being included in the wilderness areas designated in federal legislation passed last March concerning lands in Emery County.[10] While that assertion depends on inadmissible hearsay statements,[11] as well as being purely speculative as to the intentions of Congress, it also ignores that any lease cancellation as sought by Plaintiffs could not have occurred until after the March 12, 2019 effective date of said legislation, given that the *Zinke* decision, which was a precipitating factor leading to the lease suspensions, was not issued until one week after that legislation was passed.[12] Said Bloxham assertion is also questionable

---

[9] *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1237 (10th Cir. 2012).

[10] Docket no. 17-3 at ¶¶ 29-31, referring to Part II of Subtitle B of Title I of the John D. Dingell, Jr. Conservation, Management, and Recreation Act found in Public Law 116-9.

[11] See Docket no. 17-3 at ¶ 31.

[12] Cf. P.L. 116-9 date of March 12, 2019 to March 19, 2019 date of *Zinke* opinion, 368 F. Supp. 3d 41.

given that the Dingell Act established 18 different wilderness areas in Emery County,[13] every one of which was to be administered "[s]ubject to valid existing rights."[14] It is surely speculative for Mr. Bloxham to believe that the actions complained of by Plaintiffs in this lawsuit had anything to do with the scope of this Dingell Act.

Furthermore, Mr. Bloxham, in his supplemental declaration submitted with the Opposition Memorandum, attempts to suggest that if there had been cancellations of the subject leases instead of suspensions, there was a greater chance of having these subject lands added to the wilderness designations sought by the long-proposed-but-never-passed America's Red Rock Wilderness Act which SUWA has vainly sought to have enacted for more than 20 years.[15] Given that SUWA has not succeeded for more than two decades in getting this legislation passed, Mr. Bloxham's claim about the probability of SUWA's desired alternative future for these subject lands is a very tenuous, unsupported hypothetical. And, it wholly fails to meet the first standing requirement of showing an "increased risk of actual, threatened, or imminent environmental harm."

The *Rio Hondo* opinion[16] relied on by Plaintiffs is readily distinguishable. In that case, there were foreseeable on-the-ground environmental impacts downstream on the Rio Hondo River that would flow from the decision of the Forest Service to allow summertime use of the Taos ski resort area through which the river passed, namely, increased river water consumption upstream from the users below the resort, and decreased river water quality resulting from

---

[13] Section 1231 of P.L. 116-9.

[14] Section 1232 of P.L. 116-9.

[15] Docket no. 17-3 at ¶ 22.

[16] *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445 (10th Cir. 1996).

"increased vehicle travel, silt, and industrial fluids from the Ski Area's mechanical operations."[17] The later language in that opinion quoted by and relied upon by Plaintiffs, concerning NEPA's procedural aspects and uninformed decisions excusing a plaintiff from showing environmental impacts with certainty or substantial probability, addressed meeting the causation requirement of standing, only after injury in fact was adequately demonstrated.[18] Such injury in fact is not present here.

By contrast, a case more comparable to this action is *State of Utah v. Babbitt*.[19] There, the Tenth Circuit vacated a preliminary injunction granted by Judge Benson that prohibited the BLM from continuing to inventory lands for wilderness characteristics, finding that Plaintiffs lacked standing because they could not demonstrate any adequate injury in fact. In analyzing the necessity of strict compliance with standing requirements, the appellate court stated: "Standing is not measured by the intensity of a party's commitment, fervor, or aggression in pursuit of its alleged right and remedy."[20] Rather, standing requires first showing an "increased risk of actual, threatened, or imminent environmental harm."[21] This, Plaintiffs have not done. While that failure alone suffices to deprive the court of jurisdiction, there is an additional ground for concluding that Plaintiffs lack standing.

Another requirement of standing that Plaintiffs cannot meet is the redressability standard.

---

[17] *Id.* at 450.

[18] *Id.* at 452.

[19] 137 F.3d 1193 (10th Cir. 1998).

[20] *Id.* at 1202.

[21] *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1237 (10th Cir. 2012).

Tellingly, Mr. Bloxham, the Plaintiffs' standing declarant,[22] admits in the final paragraph of his supplemental declaration as follows: "if BLM elects to cancel the leases as part of its informed decisionmaking process then my harms <u>will be completely remedied because no surface disturbance could take place on the encumbered lands</u>."[23] (emphasis added) In other words, in Plaintiffs' view, eliminating surface disturbance is a complete remedy. The existing suspensions are that remedy because they already prohibit any surface disturbance for the duration of the suspensions, after which there will be new decisions that are appealable. As a result, nothing more the court might order at this point would be any more of a remedy.

Therefore, the Court should dismiss this action for Plaintiffs' lack of standing.

### III. PLAINTIFFS FAIL TO SHOW THESE SUSPENSIONS REQUIRED NEPA WORK.

Plaintiffs distort Defendants' position about why NEPA analyses were not required to be completed before BLM issued its suspension decisions. Defendants are not claiming for those decisions that NEPA requirements can be disregarded solely because the suspensions will produce environmentally beneficial impacts, as stated or suggested by Plaintiffs.[24] Rather, Defendants maintain that here, where no environmental impact can occur because the lease suspensions prohibit all ground-disturbing activity, such NEPA analyses were not required, because there is no "major Federal action significantly affecting the quality of the human environment."[25]

---

[22] Docket no. 17 at 21.

[23] Docket no. 17-3 at ¶ 40.

[24] Docket no. 17 at 11.

[25] 42 U.S.C. § 4332(2)(C)

Actions that do not change the status quo on the ground are not major federal actions.[26] In *State of Utah v. Babbitt,* the Tenth Circuit dismissed for lack of standing the plaintiffs' challenge to a BLM inventory of lands, finding that the plaintiffs had no legally protected interest because the inventory did not affect the status quo, and, therefore, was not major federal action requiring preparation of an EIS.[27] Similarly, the BLM lease suspensions at issue in this action do not change the status quo, and did not constitute major federal action that could be taken only after the completion of NEPA analyses.

Plaintiffs rely on *Catron County Bd. of Commissioners v. U.S. Fish & Wildlife Service*[28] for their argument that Defendants are required to do NEPA work before suspending the subject leases.[29] But that opinion is readily distinguishable and not applicable here. In *Catron County*, the core issue was whether federal designation of areas of critical habitat to protect threatened species was a major federal action requiring NEPA. The Tenth Circuit held that such designations under the circumstances there presented were likely to generate "immediate" environmental impacts that "could be disastrous," and thus may constitute major federal actions significantly affecting the environment, and accordingly NEPA analyses were required.[30] The Tenth Circuit in *Catron County* also rejected the United States' alternative ground in that case for not preparing NEPA analyses, based on a recent decision of the Ninth Circuit in *Douglas County v. Babbitt*,[31] namely,

---

[26] *State of Utah v. Babbitt*, 137 F.3d 1193, 1214 (10th Cir. 1998).

[27] *Id.*

[28] 75 F.3d 1429 (10th Cir. 1996).

[29] Docket no. 17 at 11-12.

[30] 75 F.3d at 1436.

[31] 48 F.3d 1495, 1505 (9th Cir. 1995).

that the Endangered Species Act (ESA) displaced NEPA.[32] However the *Catron County* opinion of the Tenth Circuit did not address and therefore did not reject the alternative conclusion of *Douglas County* that "NEPA procedures do not apply to federal actions that do nothing to alter the natural physical environment."[33] Thus, *Catron County* did not address and does not govern the issue here, whether lease suspensions initiated by the BLM in order to do more NEPA analysis are major federal actions requiring NEPA analysis. The answer to that question is they do not, because those suspensions won't alter or allow alteration of the natural physical environment.

Plaintiffs misguidedly suggest that the lease suspensions are "proposals" subject to NEPA compliance.[34] This is wrong. By both statute and regulation, the only "proposals" that are subject to NEPA are "proposals for legislation,"[35] "legislative proposals,"[36] and a "proposed major federal action to which section 102(2)(C) of NEPA [42 U.S.C. § 4332(2)(C)] applies."[37] A lease suspension is certainly not any type of legislative proposal. As to the third category of "proposals," the Supreme Court has limited those to only matters that affect the physical environment in some reasonably direct manner.[38] These lease suspensions do not affect the physical environment, they

---

[32] 75 F.3d at 1436.

[33] *Douglas County*, 48 F.3d at 1505-06.

[34] Docket no. 17 at 9.

[35] 42 U.S.C. § 4332(2)(C).

[36] 40 C.F.R. § 1508.18(a).

[37] 40 C.F.R. § 1508.19(b).

[38] *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S 766, at 772 (1983) (concerning asserted risk of psychological injury by reopening the undamaged Three Mile Island reactor, a risk found too remote from any impact on the physical environment to require NEPA compliance) ("The theme of § 102 is sounded by the adjective "environmental": NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment. If we were to seize the word "environmental" out of its context and give it the broadest possible definition, the words "adverse environmental effects" might embrace virtually any consequence of a governmental action that some one thought "adverse." But we think the context of the statute shows that Congress was talking about the physical environment—the world around us, so to speak. NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment.") (emphasis in original).

preserve the status quo of that environment. Any conceivable effect of the suspensions on future legislative protections sought by Plaintiffs are too remote and attenuated from the present physical environment to require NEPA analyses before the suspensions were issued.

Defendants do not contest that a categorical exclusion is a type of NEPA analysis. But all of the Categorical Exclusions Plaintiffs attached in their Exhibit D were made at the request of a lessee. Therefore, those examples do not undercut the basis for not doing NEPA analyses preceding the subject decisions initiated by the BLM to issue the subject lease suspensions, which do not allow for any ground-disturbing activities while BLM does further NEPA analysis on the underlying leases.

Finally, Plaintiffs' references to the BLM's NEPA Handbook only apply when the decision would have a reasonably direct effect on the physical environment. That is not the case here.

Thus, BLM did not violate any NEPA requirements in issuing the subject lease suspensions.

## CONCLUSION

For the reasons stated above, this Court should dismiss this action for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

Respectfully submitted this 15th day of November, 2019.

        John W. Huber, United States Attorney

        */s/ John K. Mangum*
        Assistant United States Attorney

Agency counsel:
C. Andres Ruedas
Attorney-Advisor, Intermountain Region
Office of the Regional Solicitor
U.S. Department of the Interior
125 South State Street, Suite 6201
Salt Lake City, Utah  84138